---

## APPEAL NO. 22-4541

---

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**UNITED STATES OF AMERICA,**

Appellee,

v.

**DAVID KEITH NUTTER,**

Appellant.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON**

---

**BRIEF OF APPELLANT DAVID KEITH NUTTER**

---

**Wesley P. Page**
**Federal Public Defender**

**Jonathan D. Byrne**
**Appellate Counsel**

**Lex A. Coleman**
**Senior Litigator, AFPD**

**U. S. Courthouse, Room 3400**
**300 Virginia Street East**
**Charleston, West Virginia 25301**
**Telephone: 304/347-3350**

*Counsel for Appellant*

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF JURISDICTION ...................................................... 1

ISSUE FOR REVIEW ...................................................................... 1

STATEMENT OF CASE .................................................................... 2

     A.    Nutter is charged with possessing firearms after having
          been convicted of misdemeanor crimes of domestic violence. .......... 2

     B.    The district court denies Nutter's initial motion to dismiss
          the indictment. ............................................................... 2

     C.    In the wake of *Bruen*, the district court similarly denies
          Nutter's renewed motion to dismiss the indictment. ........................ 4

SUMMARY OF ARGUMENT .............................................................. 7

ARGUMENT ................................................................................. 8

     18 U.S.C. § 922(g)(9) violates the Second Amendment, as properly
     analyzed following *New York State Rifle & Pistol Association, Inc. v.*
     *Bruen*, 142 S. Ct. 2111 (2022). Therefore, the district court erred by
     denying Nutter's motion to dismiss the indictment filed against him. .......... 8

     A.    Standard of Review. ......................................................... 8

     B.    The district court should have granted Nutter's motion
          to dismiss the indictment. ................................................... 8

     C.    Prior to *Bruen*, the Supreme Court identifies an individual
          right to bear arms that is greatly restricted by the lower courts. ........ 8

     D.    In *Bruen*, the Supreme Court refines the Second Amendment
          analysis and rejects the means-end analyses utilized by the
          lower courts after *Heller*. ................................................. 11

E.    The protections of the Second Amendment are not limited to "law-abiding citizens." .................................................. 19

F.    History and tradition does not support the disarmament of domestic abusers .................................................................. 25

G.    *Dicta* from the Supreme Court's decision in *Heller* does not compel a contrary result ................................................. 30

CONCLUSION ..................................................................................... 38

REQUEST FOR ORAL ARGUMENT ................................................ 38

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

## <u>Cases</u>

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .....................................*Passim*

*Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021) .......................................32, 37

*In re Bateman*, 515 F.3d 272 (4th Cir. 2008) .................................................. 32

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .............................................6, 33

*Lewis v. United States*, 445 U.S. 55 (1980) ...............................................36-37

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .......................... 10, 12, 38

*Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395 (4th Cir. 2005) ................... 32

*N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534 (4th Cir. 2016) .......................... 32

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ...*Passim*

*Schwab v. Crosby*, 451 F.3d 1308 (11th Cir. 2006) ......................................... 32

*Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269 (2008) .............. 15

*State v. Oliver,* 70 N.C. 60 (1874) .................................................................. 27

*Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) ............30-31, 32, 34

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) ........................10, 11

*United States v. Chester*, 514 F. App'x 393 (4th Cir. 2013) ........................... 11

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ..............................*Passim*

*United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016) ........................ 11

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) ................... 21

iii

*United States v. Malloy,* 568 F.3d 166 (4th Cir. 2009) ................................................ 8

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) ........................................ 31

*United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) ................................ 21

*United States v. Miller*, 307 U.S. 174 (1939) ............................................................ 22

*United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000) .......................... 32

*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) ................................................ 8

*United States v. Perez*, 6 F.4th 448 (2d Cir. 2021) .................................................... 22

*United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. 2022) ................*Passim*

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010) ......................................... 31

*United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ..................................31-32

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) ........................................... 3, 11

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) ................................. 20

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) .......................................... 31

## Constitutional Provisions

U.S. Const. amend. I .................................................................20-21, 23, 29

U.S. Const. amend. II.........................................................................*Passim*

U.S. Const. amend. IV ...........................................................................20-21

U.S. Const. amend. IX .............................................................................. 20

U.S. Const. amend. XIV ........................................................................... 14

## Federal Statutes

18 U.S.C. § 921(a)(33)(A) ................................................................ 3

18 U.S.C. § 922(g)(4) ...................................................................... 34

18 U.S.C. § 922(g)(8) ................................................................. 25-26

18 U.S.C. § 922(g)(9) .............................................................. *Passim*

18 U.S.C. § 924(a)(2) ....................................................................... 1

18 U.S.C. § 3231 .............................................................................. 1

18 U.S.C. § 3742 .............................................................................. 1

28 U.S.C. § 1291 .............................................................................. 1

## Rules

Fed. R. App. P. 34(a) ..................................................................... 38

## Other Authorities and Sources

Adam Winkler, *Heller's Catch-22*, 56 U.C.L.A. L. Rev. 1551(2009 .................... 29, 33

Carolyn B. Ramsey, *Domestic Violence and State Intervention in the American West and Australia, 1860-1930*, 86 Ind. L.J. 185, 207 (2011) ................................. 27

Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257 (2017)................. 27

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020)............................................. 35

## STATEMENT OF JURISDICTION

On August 11, 2021, an indictment was filed in the Southern District of West Virginia charging David Keith Nutter with possession of a firearm after sustaining a conviction for a misdemeanor crime of violence, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2). JA008-009. Because that charge constitutes an offense against the United States, the district court had original jurisdiction pursuant to 18 U.S.C. § 3231. This is an appeal from the final judgment and sentence imposed after Nutter pleaded guilty to the indictment. JA093-099, JA178-184. A judgment order was entered on September 15, 2022. JA187-194. Nutter timely filed a notice of appeal on September 21, 2022. JA195. The United States Court of Appeals for the Fourth Circuit has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## ISSUE FOR REVIEW

Whether 18 U.S.C. § 922(g)(9), analyzed in the light of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), violates the Second Amendment, such that the district court should have granted Nutter's motion to dismiss the indictment charging him with unlawful possession of firearms after having been convicted of misdemeanor crimes of domestic violence two decades prior.

# STATEMENT OF CASE

This case arises from Nutter's possession of firearms after having been convicted, decades prior, of misdemeanor crimes of violence. There is no dispute that Nutter possessed those firearms or sustained those prior convictions. The only dispute is whether convicting Nutter for that possession violates the Second Amendment to the United States Constitution.

### A. Nutter is charged with possessing firearms after having been convicted of misdemeanor crimes of domestic violence.

In July of 2019, a sheriff's deputy received information that Nutter had firearms in his home. The deputy investigated and learned that Nutter had prior convictions in Ohio related to domestic violence. JA073. Officers executed a search warrant at Nutter's home, recovering a revolver, two shotguns, and a .22 caliber rifle. JA074.

As a result of the search, Nutter was charged by indictment with violating 18 U.S.C. § 922(g)(9) for possessing firearms after having sustained convictions for misdemeanor crimes of domestic violence. JA008-009. Specifically, one conviction was sustained in 1998, the other two in 2002, both in Ohio. JA009.

### B. The district court denies Nutter's initial motion to dismiss the indictment.

Nutter filed a motion to dismiss the indictment, on two grounds. JA010-015. First, he argued that his prior convictions did not meet the definition of

"misdemeanor crime of domestic violence" as defined in 18 U.S.C. § 921(a)(33)(A). JA011-014.[1] Second, he argued that "18 U.S.C. § 922(g)(9) violates the Second Amendment, as applied to him," noting that since 2002 he had "lived as a law abiding citizen, who should retain and enjoy the fundamental core right to individual self defense protected by the Second Amendment." JA011, JA014-015.

On May 17, 2022, the district court denied Nutter's motion to dismiss the indictment in a written opinion and order. JA049-057. The district court first concluded that Nutter's prior convictions were misdemeanor crimes of domestic violence that would trigger § 922(g)(9) liability. JA051-055. The district court then rejected Nutter's Second Amendment challenge, relying on this Court's precedents decided in the wake of the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), declaring it "bound by the precedent to which [Nutter] objects." JA055-057, *citing United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), and *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011).

Following the denial of Nutter's motion to dismiss, the parties entered into a conditional plea agreement, in which Nutter agreed to plead guilty to the indictment while retaining his right to appeal the district court's denial of his motion to suppress. JA093-099.

---

[1] Nutter is not pursuing that issue as part of this appeal.

3

**C.    In the wake of *Bruen*, the district court similarly denies Nutter's renewed motion to dismiss the indictment.**

On June 23, 2022, after Nutter had entered his guilty plea but prior to sentencing, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). On August 1, 2022, Nutter filed a second motion to dismiss the indictment based on *Bruen*. JA102-105.

The Government made several arguments in response. JA106-115. First, the Government argued that Second Amendment protections applied only to "law-abiding citizens," a class that did not include those convicted of domestic violence offenses. JA107-109. Second, the Government argued that the "class of persons with which § 922(g)(9) is concerned . . . have historically been restricted from firearm ownership and possession." JA109. Finally, the Government pointed to "[h]istorical regulations regarding domestic violence" that supported the constitutionality of § 922(g)(9). JA110-114.

In reply, Nutter argued that the Government failed "to establish the existence of a robust tradition of firearm regulation disarming domestic violence misdemeanants <u>at the time of the Founding</u>," which is what *Bruen* requires. JA116. He also argued that the Government used the "pre-*Bruen* law-abiding citizen construct" as a means to "resuscitate a key mechanism of the means-end scrutiny analysis *Bruen* expressly rejected." *Ibid.* The cases cited by the Government to show "a longstanding history of disarming violent criminals" all "applied mean-

4

end scrutiny to sustain the challenged firearm regulation resulting in civilian disarmament." JA118. Instead, "the government's historical recitation ends up supporting defendant's motion." *Ibid.*

The district court denied Nutter's renewed motion to dismiss in a second written opinion and order. JA122-137. The district court began by noting that its denial of Nutter's initial motion to dismiss "relied upon binding Fourth Circuit precedent" that "relied in part upon the means-end scrutiny rejected in *Bruen*," leaving it with no obligation to follow "otherwise binding Circuit precedent." JA127-128. Applying *Bruen*, the district court "presumes without deciding" that the "conduct at issue – possession of guns in common use – is protected by the Second Amendment, leaving the Court to address whether the regulation prohibiting people convicted of misdemeanor crimes of domestic violence from such possession is consistent with the understanding of the Second Amendment at the time of its enactment." JA126. The district court concluded that it was, noting that *Bruen* "focuses on regulations impacting law-abiding citizens, as opposed to the class of regulations prohibiting certain people from carrying firearms." JA128-129.

While noting that "the Fourth Circuit and many commentators have recognized" that "there is not clear historical evidence" that the "longstanding" prohibitions mentioned in *Heller*, "dating to the early 20th century, existed in

5

similar form in the founding era," the district court concluded that to "suggest that only people convicted of crimes with an exact historical analogue can be subject to gun restrictions would lead to absurd results." JA129-130. "The core question" for the district court was "whether the prohibition at issue would have been viewed as consistent with the Second Amendment in the founding era" and the "absence of an equivalent prohibition on firearm possession by people convicted of domestic violence offenses is not dispositive." JA130. Examining the historical record, the district court concluded that it "reflects significant regulation of firearms" including complete bans of the possession of them by suspect groups. JA132, *citing Kanter v. Barr*, 919 F.3d 437, 457-458 (7th Cir. 2022)(Barret, J., dissenting)("founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety"). Section 922(g)(9) "fits easily within this framework of regulation consistent with the history and purposes of the Second Amendment and designed to keep firearms away from dangerous people." JA133. "Individuals who pose a threat to the safety of their families," the district court concluded, "would not have been welcome as part of a 'well-regulated' militia and permitting them to possess firearm runs starkly counter to the public safety goals of the Second Amendment." *Ibid*. Thus, the "prohibition of firearms by domestic violence misdemeanants, and other groups identified as dangerous, is

supported by history." JA134. Therefore, Nutter's motion to dismiss had to denied. JA137.

Following the denial of Nutter's second motion to dismiss, the parties entered into an amended plea agreement that was, in all aspects, the same as the first, except that the conditional plea language was expanded to allow Nutter to appeal the denial of both motions to dismiss. JA178-184. Nutter ultimately was sentenced to twelve months in prison, to be followed by a three-year term of supervised release. JA188-189.

## SUMMARY OF ARGUMENT

The district court erred by denying Nutter's motion to dismiss. Nutter was convicted for the simple possession of firearms two decades after having been convicted of misdemeanor crimes of domestic violence. The Second Amendment, as elucidated by the Supreme Court, protects an individual's right to bear arms for self-defense. The act for which Nutter was convicted – simple possession of firearms – is the heartland of conduct that the Second Amendment protects. Nutter's right to possess firearms for self defense can only be stripped if such a deprivation was "deeply rooted in this Nation's history and tradition." An examination of that history shows that disarming domestic violence misdemeanants is of recent vintage and that the law at the time the Second Amendment was ratified dealt with such actors, if at all, by means other than

7

disarmament. Because Nutter's prior convictions would not have resulted in disarmament at the time of ratification, the district court erred in denying his motion to dismiss the indictment under which he was ultimately convicted.

## ARGUMENT

**18 U.S.C. § 922(g)(9) violates the Second Amendment, as properly analyzed following *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Therefore, the district court erred by denying Nutter's motion to dismiss the indictment filed against him.**

### A.    Standard of Review

This Court reviews *de novo* questions of whether a conviction under 18 U.S.C. § 922(g) violates the Second Amendment. *United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012); *see also United States v. Malloy,* 568 F.3d 166, 171 (4th Cir. 2009)("This court reviews a challenge to the constitutionality of a federal statute *de novo*").

### B.    The district court should have granted Nutter's motion to dismiss the indictment.

The Second Amendment protects the right to bear arms for self-defense, as the Supreme Court held in *Heller*. In the wake of *Heller*, numerous courts, including this one, applied *Heller* using an interest-balancing test to conclude that 18 U.S.C. § 922(g)(9) did not violate the Second Amendment. In *Bruen*, the Supreme Court rejected such an analysis and held that regulations must be evaluated under the Second Amendment based on the history and traditions of

8

the United States. An examination of the history and traditions related to firearms and domestic violence does not demonstrate any support for permanently disarming those convicted of misdemeanor crimes of domestic violence. For that reason, the district court should have granted Nutter's motion to dismiss the indictment charging him with a violation of § 922(g)(9).

### C. Prior to *Bruen*, the Supreme Court identifies an individual right to bear arms that is greatly restricted by the lower courts.

The Second Amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. The Supreme Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following ratification in 1791, evidence of how the Second Amendment was interpreted in the century after its enactment in legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary. *Id.* at 592-619. Based on this survey, the Supreme Court concluded that the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather,

"the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Supreme Court therefore struck down statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after later, the Supreme Court reaffirmed *Heller*'s "central holding" that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). The Supreme Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 767. That right, the Supreme Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for analyzing Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Ibid.* But if the statute did burden Second Amendment conduct, courts then "applied the appropriate

form of means-end scrutiny." *Ibid.* (cleaned up). Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller* – the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

This Court applied that analysis to challenges brought to prosecutions under § 922(g)(9), ultimately rejecting them. *See, e.g.*, *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010); *United States v. Chester*, 514 F. App'x 393 (4th Cir. 2013); *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011). Were that the current state of the law Nutter would have no claim in this Court. However, as the district court correctly held, those earlier decisions are no longer binding precedent in the wake of the Supreme Court's decision in *Bruen*.

**D.    In *Bruen*, the Supreme Court refines the Second Amendment analysis and rejects the means-end analyses utilized by the lower courts after *Heller*.**

*Bruen* was the result of a challenge to New York's scheme for issuing permits to carry handguns. That scheme required that, to obtain such a permit, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23.

11

The petitioners argued that such a scheme violated their rights under the Second Amendment. The Supreme Court agreed. *Bruen* expressly disavowed the lower courts' post-*Heller* framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's **conduct**." *Bruen*, 142 S. Ct. at 2126 (emphasis added). If it does, then "the Constitution presumptively protects that **conduct**." *Ibid.* (emphasis added). Answering this threshold question in *Bruen* was straightforward. The Supreme Court had "little difficulty concluding" that the Second Amendment protected the petitioners' "proposed course of conduct – carrying handguns publicly for self-defense." *Id.* at 2134. As the Court explained, "nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Ibid.* (cleaned up). The Second Amendment therefore "presumptively guarantees" a right to carry firearms in public, and New York's "proper cause" requirement, which burdened that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

To rebut the presumption of unconstitutionality, it is not enough for the Government to "simply posit that the regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Ibid.* This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141, n.11. Put differently, the tie goes to the Second Amendment claimant. *Id.* at 2139 (where history is "ambiguous at best," it "is not sufficiently probative to defend" a regulation).

The Supreme Court reinforced *Heller*'s holding that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136, *quoting Heller*, 554 U.S. at 634-635. For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is that

which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[2] Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates" ratification "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Ibid.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136. Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *Id.* at 2137 ("[a]s we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources"). Evidence from "the mid- to late-19th-century" provides little "insight into the

---

[2] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

meaning of the Constitution." *Ibid.*, *quoting Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008)(Robert, C.J., dissenting) Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Ibid.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Ibid.* As the Supreme Court noted, "to the extent later history contradicts what the text says, the text controls." *Ibid.*

*Bruen* held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Bruen*, 142 S. Ct. at 2138-56. In reaching that conclusion, the Supreme Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow. The Supreme Court said, for instance, that "[i]n some cases," the historical inquiry "will be fairly straightforward." *Id.* at 2131. For example, when "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Ibid.* "Likewise," the Supreme Court continued, "if earlier generations addressed the societal problem, but did so through materially

15

different means, that also could be evidence that a modern regulation is unconstitutional." *Ibid.* Finally, "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Ibid.* In other words, if "the Founders themselves could have adopted" a particular regulation "to confront" a "perceived societal problem," but did not do so, then that regulation is unconstitutional today. *Ibid.*

In "other cases," challenged statutes will "implicate unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132 (cleaned up). When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Ibid.*[3]

Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations *are relevantly similar*." *Bruen*, 142 S. Ct at 2132 (emphasis added). The Supreme Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment,"

---

[3] *Bruen* directs courts to use "analogical reasoning" only when confronting "present-day firearm regulations" that "were unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132.

but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" – the how – and "whether that burden is comparably justified" – the why – "are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (cleaned up).

The Supreme Court also stressed the limits of reasoning by analogy, noting that it "is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. Courts "should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Ibid.* However, "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Ibid.*

Whether based on "distinctly similar" precursors or merely historical analogues, the "comparable tradition of regulation" must be robust, requiring "a well-established and representative" historical analogue. *Bruen*, 142 S. Ct. at 2133. Such a "governmental practice" can "guide . . . interpretation of an ambiguous constitutional provision" if that practice "has been open, widespread, and

17

unchallenged since the early days of the Republic." *Id.* at 2137. A handful of "outlier" statutes or cases from a small number of "outlier jurisdictions" do not demonstrate a historical tradition. *Id.* at 2153, 2156. The Supreme Court expressed "doubt," for instance, that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition. *Id.* at 2142. In evaluating 19th-Century surety laws that New York argued were precursors to its proper cause requirement, the Court discounted two of those ten laws – which were closest to New York's – as unrepresentative. *Id.* at 2148, n.24. Moreover, even if certain statutes were widespread, courts should not consider them determinative unless the historical record reveals the statutes were actually enforced. *Id.* at 2149 (dismissing surety laws because "respondents offer little evidence that authorities ever enforced surety laws").

Finally, *Bruen* repeatedly emphasized that "the burden falls on" the defenders of a regulation to show that regulation "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The "government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Thus, in *Bruen* itself, "because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the

18

Second Amendment's text and historical scope." *Id.* at 2141, n.11. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130, n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150.

### E.    The protections of the Second Amendment are not limited to "law-abiding citizens."

In rejecting the "interest-balancing inquiry" proposed by Justice Breyer's dissent, the *Heller* majority explained that the Second Amendment "is the very *product* of an interest balancing by the people." *Heller*, 554 U.S. at 634-35. The result is that judges lack authority to conduct that balancing "anew" or "decide on a case-by-case basis whether the right is *really worth* insisting upon." *Ibid.* Regardless, the Supreme Court wrote, "whatever else it leaves to future evaluation," the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. Based on this language, the government has argued elsewhere that only "law-abiding, responsible citizens" enjoy the right to keep and bear arms. The district court was correct in assuming that Nutter, and others with prior misdemeanor domestic violence convictions, were within the protections of the Second Amendment. JA126.

To conclude otherwise requires a plain misreading of *Heller*. The Court in *Heller* did not limit the Second Amendment right to law-abiding, responsible citizens. Rather, it said that, at the very least, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the Supreme Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Supreme Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did not address whether, much less rule out the conclusion that, other people have that right, too.

That conclusion is supported by *Heller*'s discussion of what "the people" means in the Second Amendment context. The Supreme Court said the term "the people," as used across Constitutional provisions, unambiguously refers to all members of the political community, "not an unspecified subset." *Heller*, 554 U.S. at 580. The term "the people" is a "term of art" that has a uniform meaning in the First, Second, Fourth, and Ninth Amendments, referring to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Ibid.*, *quoting United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). *Heller* further said the right protected by the Second Amendment "belongs to all Americans." *Ibid.* Nutter is undoubtedly part of the "national community," just as he is part of

20

"all Americans." Were he excluded, that would mean "the people" as used in the Second Amendment refers to "an unspecified subset" of people – a proposition *Heller* rejected. If the Government is correct that breaking the law strips citizens of their Second Amendment rights, then breaking the law would also strip citizens of their First and Fourth Amendment rights. Yet domestic violence misdemeanants do not lose their rights to free speech or their right to be free from unlawful searches and seizures. Therefore, both Nutter himself and his conduct fall within the plain text of the Second Amendment, such that his conduct is presumptively protected by the Constitution. *See, e.g., United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022)("dangerous felons" are indisputably part of "the people"); *United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015).

*Heller*'s qualifying language is clear, but to the extent it was ambiguous, *Bruen* clarified that ambiguity. *Heller* references law-abiding, responsible citizens' right to use arms "in defense of hearth and home." *Heller*, 554 U.S. at 635. If that passage were meant to demarcate the outer limits of the Second Amendment right, then even law-abiding, responsible citizens would have no right to use firearms outside the home. But *Bruen* held the Second Amendment right does extend outside the home. *Bruen*, 142 S. Ct. at 2134. The Supreme Court gave no hint that it believed it was contradicting what it said in *Heller*. Thus, *Bruen*

confirms that it would be a mistake to read *Heller*'s "law-abiding, responsible citizens" language as a limitation on the Second Amendment.

*Heller* also used the word "law-abiding" during a discussion of *United States v. Miller*, 307 U.S. 174 (1939), which the District of Columbia cited to support its collective-rights view of the Second Amendment. The *Heller* Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller,* 554 U.S. at 625. This reference to "law-abiding" citizens does not suggest, much less hold, that only the law-abiding enjoy Second Amendment rights. As the *Heller* Court emphasized, *Miller* addressed "the type of weapon[s]" that are "eligible for Second Amendment protection" – which *Heller* explicitly contrasted with the question of the type of people who are eligible for Second Amendment protection. *Id.* at 622. *Miller* did not turn on whether "the Second Amendment protects only those serving in the militia," but rather on "the character of the weapon" at issue in that case. *Ibid.*; *see also United States v. Perez*, 6 F.4th 448, 451 (2d Cir. 2021)(*Heller* "considered the scope of the Second Amendment along two dimensions: what types of 'arms' are protected and who are among 'the people'"). *Heller*'s use of the word "law-abiding," therefore, provides no support for the view that those convicted of domestic violence misdemeanors are outside the scope of the Second Amendment's protection.

22

Nutter recognizes that, at times, *Bruen* repeats *Heller*'s "law-abiding citizens" formulation. *E.g., Bruen*, 142 S. Ct. at 2156. But that is because the petitioners' claim, as "set forth in the pleadings below," was that they were "law-abiding, adult citizens," and the Court granted *certiorari* to decide only whether "New York's denial of petitioners' license applications violated the Constitution." *Id.* at 2124-25. No other questions were before the Court in *Bruen*. *Heller*'s description of the right to bear arms "in the home" does not mean the Second Amendment is inapplicable to other places, and the same is true here: *Bruen*'s description of "law-abiding citizens" does not mean the Second Amendment is inapplicable to other people.

If *Bruen* excluded the non-law-abiding from the Second Amendment, the opinion would suffer from hopeless internal inconsistency. *Bruen*'s central lesson is that history is paramount in Second Amendment interpretation – a point the Supreme Court made over and over again. *See, e.g., Bruen*, 142 S. Ct. at 2127 (*Heller* "demands a test rooted in the Second Amendment's text, as informed by history."); *Ibid.* (*Heller* "looked to history because 'it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right."'; *Id.* at 2128-29 (*Heller*'s "methodology centered on constitutional text and history."); *Id.* at 2129 (describing means-ends balancing as "inconsistent with *Heller*'s historical approach"); *Id.* at 2130 (likening Second Amendment to First Amendment

23

because, in both instances, "to carry [its] burden, the government must generally point to *historical* evidence about the reach of the [amendment's] protections"; *Ibid.* ("beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims."); *Id.* at 2131 (the "test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); I*d.* at 2135 ("the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation."); *Id.* at 2138 ("[w]e conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional."); *Id.* at 2145 ("all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry").

Yet as explained below, the historical record provides no support whatsoever for laws that disarm those previously convicted of misdemeanor crimes of domestic violence. The government's position would have this Court hold, based solely on an implication unnecessary to *Bruen*'s holding, that the

question of whether non-law-abiding citizens can possess firearms is, uniquely among all issues of Second Amendment interpretation, exempt from the requirement that the amendment's scope be firmly rooted in history. Nothing in *Bruen* permits that result

### F.      History and tradition does not support the disarmament of domestic abusers.

The Government did not, and more importantly cannot, show that there was an established history at the time of the ratification of the Second Amendment that domestic abusers were disarmed as a result of that conduct. In ultimately concluding that 18 U.S.C. § 922(g)(8), which makes it a crime to possess a firearm while subject to a domestic violence restraining order, violates the Second Amendment, the court in *United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. 2022), performed a thorough examination of the historical record with regard to purveyors of domestic violence and found it wanting when it came to regulating their possession of firearms. The same history must lead to the same conclusion for those, like Nutter, prosecuted under § 922(g)(9).

To begin, the court held that "*Bruen's* first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm." *Perez-Gallan*, 2022 WL 16858516 at *3. Going back to the *Heller*, the court concluded that "to 'keep arms' means to 'have weapons.' The plain meaning of 'have' is 'to be in possession of.'" *Ibid*. "Thus," the court

concluded, "the Second Amendment's 'keep and bear arms' language plainly encompasses possession"[4] and, therefore, "§ 922(g)(8)'s constitutionality hinges on whether regulations prohibiting those subject to a protective order from possessing a firearm align with the Nation's historical tradition of firearm regulation." *Ibid.*

As for the history of the regulation itself, the court noted that "§ 922(g)(8)'s history started in 1994 – less than 30 years ago" in the Violent Crime Control and Law Enforcement Act of 1994. *Perez-Gallan*, 2022 WL 16858516 at *4. That made it "adolescent by *Bruen*'s standards." *Ibid.* Section 922(g)(9) is not meaningfully older, "having been enacted in 1986," which this Court called "recent vintage." *Chester*, 628 F.3d at 681.

Turning to the history of domestic abuse itself, the court observed that "[d]omestic abusers are not new," but that "until the mid-1970s, government intervention – much less removing an individual's firearms – because of domestic violence practically did not exist." *Perez-Gallan*, 2022 WL 16858516 at *5. Abusers were prosecuted "infrequently," according to surveys of the Plymouth and other New England colonies, most likely because such incidents were handled by church courts "which relied on public shaming more than anything else." *Ibid.* Moving to the 19th Century, the court noted that "removing firearms from an

---

[4] Notably, "the Government doesn't contest this interpretation." *Perez-Gallan*, 2022 WL 16858516 at *3.

abuser – through government intervention or otherwise – was still not a prevalent occurrence." *Id.* at *6. The court highlighted one researcher's work on states in the American west between 1860 and 1930 which revealed that "the usual mode of punishment for domestic violence was a fine," although some offenders "could receive a whipping or jail time." *Ibid.*[5] Furthermore, in that era "many states still adhered to the belief that without serious violence, the government should not interfere in family affairs." *Ibid.*, *citing State v. Oliver,* 70 N.C. 60, 61-62 (1874)(if "no permanent injury has been inflicted, nor malice, cruelty nor dangerous violence shown by the husband, it is better to draw the curtain, shut out the public gaze, and leave the parties to forget and forgive"). Another researcher, the court notes, agrees that "even into the early twentieth century, judges were 'more likely to confiscate a wife beater's liquor than his guns.'" *Ibid.*, *quoting* Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017). The court concluded that its "historical inquiry aligns with what almost all circuit courts realized pre-*Bruen* – historical restrictions on 'who' may possess a firearm are almost nonexistent." *Ibid.* This Court was among those whose historical analyses came up empty for examples of disarmament. In *Chester*, this Court noted that if "the historical evidence on whether felons enjoyed the right to possess and carry arms is inconclusive, it would likely be even more so with respect to domestic-

---

[5] Relying on Carolyn B. Ramsey, *Domestic Violence and State Intervention in the American West and Australia, 1860-1930*, 86 Ind. L.J. 185, 207 (2011).

27

violence misdemeanants." *Chester*, 628 F.3d at 681. Thus, this Court was "certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors." *Ibid*. *Chester* was not an outlier. As the *Perez-Gallan* court explained, while "the above circuit courts eventually upheld the regulations using means-end scrutiny . . . a consistent theme was how little historical support the record contained." *Perez-Gallan*, 2022 WL 16858516 at *8.

The district court sidestepped the paucity of historical evidence because "the legal landscape surrounding crime and punishment was vastly different" at the time the second amendment was ratified. JA130. Furthermore, the district court concluded that to "suggest that only people convicted of crimes with an exact historical analogue can be subject to gun restrictions would lead to absurd results." *Ibid.* As a result, "the absence of an equivalent prohibitions on firearm possession by people convicted of domestic violence offenses is not dispositive." *Ibid.*

Rather than rely on a historical tradition of disarming domestic abusers, the district court erroneously turned to broader regulations "designed to ensure responsible and safe gun ownership." JA132. In addition to regulations related to registration and training, "there were 'complete bans on gun ownership by free blacks, Native Americans, and those of mixed race' as well as people who 'refused

28

to swear loyalty oaths.'" *Ibid.*, *quoting* Adam Winkler, *Heller's Catch-22*, 56 U.C.L.A. L. Rev. 1551, 1562-63 (2009). Such bans were racist and would not withstand any sort of scrutiny under modern concepts of due process or equal protection. Nonetheless, the district court concluded that those who "pose a threat to the safety of their families . . . would not have been welcome as part of a 'well-regulated' militia and permitting them to possess firearms runs starkly counter to public safety goals of the Second Amendment." JA133. Therefore, the "prohibition on possession of firearms by those convicted of misdemeanor crimes of domestic violence fits easily within the framework of regulation consistent with the history and purposes of the Second Amendment and designed to keep firearms away from dangerous people." *Ibid.*

The district court thus dragoons regulations steeped in prejudices the nation would not countenance today. Laws disarming free blacks and Native Americans simply for being who they are would run afoul of due process and equal protection provisions. Laws disarming those who would not swear allegiance to a particular government would fall afoul of the First Amendment. Relying on such bans to conclude that a prohibition on the possession of firearms by domestic abusers – who existed at the time of ratification – is unsound. It requires, as the *Perez-Gallan* court put it, a "leap of faith," not that "the colonies wished to keep the public safe from those seen as 'dangerous,'" but that the

29

"colonies considered domestic abusers a 'threat to *public safety*.'" *Perez-Gallan*, 2022 WL 16858516 at *11. The historical record simply does not support that conclusion at all, in any way, or in any form. *Ibid.*

**G.** ***Dicta*** **from the Supreme Court's decision in** ***Heller*** **does not compel a contrary result.**

After completing its historical survey, and before assessing the constitutionality of the relevant regulations, the Supreme Court in *Heller* inserted what another court called some "precautionary language." *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016)(*en banc*). The Supreme Court wrote that the Second Amendment right "is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. It then added that although "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other regulations not relevant to this appeal. *Id.* at 626. In an accompanying footnote, the Supreme Court further explained that, these presumptively lawful regulatory measures" were used "only as examples" and the list "does not purport to be exhaustive." *Id.* at 627 n.26.

In other cases, the government has argued this portion of *Heller* definitively establishes that felon-disarmament laws, and by analogy similar laws that

categorically disarm a category of people based on prior conduct such as § 922(g)(9), are consistent with the Second Amendment. That view is incorrect. The question of felon-disarmament laws' constitutionality was not before the Court in *Heller*, and any statements in the opinion addressing that question are therefore "dicta." *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *see also, e.g., Tyler*, 837 F.3d at 686-87 (describing *Heller*'s "presumptively lawful" language as "dictum"); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same); *United States v. McCane*, 573 F.3d 1037, 1049 (10th Cir. 2009) (Tymkovich, J., concurring)(characterizing "presumptively lawful" language as "the opinion's *deus ex machina* dicta"). The result is that, as the *en banc* Seventh Circuit explained, the presumptively lawful list in *Heller* should not be treated as a holding, because the "language we have quoted warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010)(*en banc*). "What other entitlements the Second Amendment creates," the court observed, "and what regulations legislatures may establish, were left open." *Ibid. Heller* "is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general

expressions must be read in light of the subject under consideration." *Ibid., see also Tyler*, 837 F.3d at 687.

Of course, lower courts should "give great weight to Supreme Court *dicta*," *N.L.R.B. v. Bluefield Hosp. Co., LLC*, 821 F.3d 534, 541 n.6 (4th Cir. 2016), at least when the opinion engages in an "extended discussion" of an issue, it gives "full and careful consideration to the matter," and the issue is "important, if not essential, to the Court's analysis," *Hengle v. Treppa*, 19 F.4th 324, 346-47 (4th Cir. 2021). Ultimately, however, lower courts "are not bound by *dicta* or separate opinions of the Supreme Court." *Myers v. Loudoun Cty. Pub. Sch.*, 418 F.3d 395, 406 (4th Cir. 2005). Where the Supreme Court's discussion of an issue is "peripheral" or "cursory," courts need not defer to it. *Hengle*, 19 F.4th at 347. This Court has therefore declined to give "talismanic effect" to Supreme Court *dicta* that is "unaccompanied by any analysis from which [it] might gain insight into the Court's reasoning." *In re Bateman*, 515 F.3d 272, 282-283 (4th Cir. 2008). Other courts, too, disregard *dicta* for which the Supreme Court provides no reasoning or analysis. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000)("we conclude that the brief dictum to which we allude should not dictate the result here"); *cf. Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006)(choosing to follow Supreme Court dicta because it was "not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta").

*Heller*'s discussion of "presumptively lawful regulatory measures" is exactly the kind of Supreme Court *dicta* which is not entitled to "talismanic effect." It was "unaccompanied by any analysis" and was, at best, "peripheral" to the questions at issue in that case. The *Heller* Court provided no "extended discussion" of felon-disarmament laws. While *Heller* described felon-disarmament laws as "longstanding," it "never actually addressed the historical pedigree" of those laws, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)(Barrett, J., dissenting). Indeed, the Supreme Court prefaced its reference to "longstanding prohibitions on the possession of firearms by felons" by noting that it did "not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. The Supreme Court, in other words, did not even claim it had surveyed the relevant history and discovered a (robust but undisclosed) tradition of felon-disarmament laws dating back to the founding era. It simply asserted such laws were longstanding, and therefore presumptively lawful, "without any reasoning or explanation." Winkler, *supra*, at 1567; *see also Chester*, 628 F.3d at 679 ("*Heller* described its exemplary list of 'longstanding prohibitions' as 'presumptively lawful regulatory measures' without alluding to any historical evidence that the right to keep and bear arms did not extend to felons").

But felon-disarmament laws are *not* longstanding – at least not in the sense that *Bruen* would use that term. It appears that no American jurisdiction enacted

33

such a law until the 20th Century, Congress did not pass the federal statute disarming felons until 1938, and the statute disarming domestic violence misdemeanants until 1986. *Heller*'s discussion of "longstanding" felon-disarmament laws, therefore, is not just *dicta*, but *dicta* based on a factually unsupportable premise. That is a slender reed on which to rest the categorical denial of an enumerated constitutional right. As the *en banc* Sixth Circuit has observed, absent "historical evidence conclusively supporting a permanent ban on the possession of guns" by felons, "it would be odd to rely solely on *Heller* to rubber stamp the legislature's power to permanently exclude individuals from a fundamental right based on a past [felony conviction]." *Tyler*, 837 F.3d at 687. The court applied that reasoning when analyzing 18 U.S.C. § 922(g)(4)'s prohibition of firearm possession by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution," which aligns with another category of laws *Heller* called "presumptively lawful," ultimately "[r]efusing to give *Heller* conclusive effect in this case is particularly proper given § 922(g)(4)'s lack of historical pedigree."

Heller itself indicates that its *dicta* should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to longstanding felon-disarmament laws as "*ipse dixit*," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. *Heller,* 554 U.S. at 721-22. The majority responded

that there would "be time enough to expound upon the historical justifications for
the exceptions we have mentioned if and when those exceptions come before us."
*Id.* at 635. This rejoinder suggests the *Heller* Court assumed "felons can be
deprived of the [Second Amendment] right if that deprivation is consistent with
history and tradition." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020). The
Supreme Court's allusion to "expound[ing] upon the historical justifications" for
felon-disarmament laws would make no sense if the Court believed felons could
be disarmed regardless of whether history supported that exclusion.

Crucially, the Supreme Court stressed that it had not canvassed the
historical record and made a determination, one way or the other, about whether
that record supported felon-disarmament laws, stating that "we do not undertake
an exhaustive historical analysis today of the full scope of the Second
Amendment." *Heller*, 554 U.S. at 626. *Bruen*, in turn, affirmed that *Heller* did not
purport to settle any questions beyond those necessary to resolve the petitioners'
claim in that case. *Bruen,* 142 S. Ct. at 2128 (noting *Heller* described Second
Amendment right as "not unlimited," but adding, "we cautioned that we were not
undertaking an exhaustive historical analysis today of the full scope of the Second
Amendment and moved on to considering the constitutionality of the District of
Columbia's handgun ban")(cleaned up ).

35

Even more telling is *Heller*'s discussion of *Lewis v. United States*, 445 U.S. 55 (1980). The defendant in that case, who was convicted under the federal felon-in-possession statute, argued the prosecution violated his equal-protection rights because his underlying felony conviction had been secured in the absence of counsel. *Id.* at 58, 65. The Court rejected that argument, reasoning that Congress "could rationally conclude that any felony conviction, even an allegedly invalid one, is a sufficient basis on which to prohibit the possession of a firearm." *Id.* at 66. In *Heller*'s words, the *Lewis* Court then "commented gratuitously, in a footnote," on a Second Amendment question that was not "raised or briefed by any party." *Heller,* 554 U.S. at 625 n.25. Specifically, the *Lewis* Court observed that these "legislative restrictions on the use of firearms are neither based upon constitutionally suspect criteria, nor do they trench upon any constitutionally protected liberties." *Lewis*, 445 U.S. at 65, n.8. The *Heller* Court went out of its way to make clear it was not bound by *Lewis*' interpretation of the Second Amendment, writing that it "is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued." *Heller,* 554 U.S. at 625 n.25.

To accept that *Heller* settled the constitutionality of felon-disarmament and similar laws would be to do exactly what that case called "inconceivable":

interpreting "the basic meaning" of the Second Amendment based on "a footnoted dictum in a case where the point was not at issue and was not argued." *Heller*, 554 U.S. at 627 n.26. Indeed, treating *Heller*'s "presumptively lawful" language as binding would be especially ironic given that, in the footnote *Heller* disclaimed as *dicta*, *Lewis* suggested felon-disarmament laws do not violate the Second Amendment. *Lewis*, 445 U.S. at 65 n.8 (citing three court of appeals opinions to that effect).

Finally, even if the *Heller dicta* might once have warranted deference, it no longer does today. Lower courts need not follow Supreme Court *dicta* that has been "enfeebled by later statements" in other Supreme Court cases. *Hengle*, 19 F.4th at 347. That is the case here. It may be true that nothing in *Heller* casts "doubt on longstanding prohibitions on the possession of firearms by felons," *Heller*, 554 U.S. at 626, but *Bruen*'s new framework plainly does cast doubt on such laws. As explained above, *Bruen* demands a "text-and-history" analysis that looks only to "the Second Amendment's plain text" and our "Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2126, 2138. Neither of those sources provides any support for felon-disarmament laws, much less those disarming misdemeanants. It is perhaps unsurprising, then, that the Court in *Bruen* did not repeat *Heller*'s *dicta* about "longstanding" and "presumptively lawful" felon-disarmament laws.

Rather than following historically unsupportable *dicta* from *Heller*, this Court should adhere to the binding framework supplied by *Bruen*. Elevating *Heller*'s *dicta* over *Bruen*'s holding would treat the Second Amendment right "as a second-class right," contrary to the Supreme Court's admonishment. *McDonald,* 561 U.S. at 780.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court's denial of Nutter's motion to dismiss the indictment in this case. Nutter's conduct, the simple possession of firearms, is protected by the Second Amendment and there is no deeply-rooted history or tradition in this country of disarming those, like Nutter, who have prior convictions for misdemeanor crimes of domestic violence.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 34(a) of the Federal Rules of Appellate Procedure, Nutter hereby requests oral argument. To counsel's knowledge, this Court has not yet addressed the impact of *Bruen* on Second Amendment caselaw, nor has it reviewed the validity of § 922(g)(9) in the wake of *Bruen*. Oral argument will greatly assist the Court in reaching its conclusion.

Respectfully submitted,

**DAVID KEITH NUTTER**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Jonathan D. Byrne**
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: jonathan_byrne@fd.org

**s/Lex A. Coleman**
Lex A. Coleman
Assistant Federal Public Defender
Office of the Federal Public Defender
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: lex_coleman@fd.org

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.     This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    this brief contains *8802* words

2.     This brief complies with the typeface and type style requirements because:

    this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2016* in *14 pt Garamond*.

    **DATE:**     January 6, 2023

                          s/Jonathan D. Byrne
                          Jonathan D. Byrne
                          Appellate Counsel
                          Room 3400, United States Courthouse
                          300 Virginia Street East
                          Charleston, West Virginia 25301
                          E-mail: jonathan_byrne@fd.org

                          s/Lex A. Coleman
                          Lex A. Coleman
                          Assistant Federal Public Defender
                          Room 3400, United States Courthouse
                          300 Virginia Street East
                          Charleston, West Virginia 25301
                          E-mail: lex_coleman@fd.org

## CERTIFICATE OF SERVICE

We hereby certify that on **January 6, 2023,** the foregoing **BRIEF** was electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Andrew Tessman
Assistant United States Attorney
United States Courthouse, Room 4000
300 Virginia Street East
Charleston, West Virginia 25301
Email: andrew.tessman@usdoj.gov

s/Jonathan D. Byrne
Jonathan D. Byrne
Appellate Counsel
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: jonathan_byrne@fd.org

s/Lex A. Coleman
Lex A. Coleman
Senior Litigator, AFPD
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
E-mail: lex_coleman@fd.org