United States Court of Appeals
for the Fourth Circuit
No. 22-4541

———————————————

United States,
Appellee,
v.

David Nutter,
Appellant.

———————————————

Appeal from the United States District Court
for the Southern District of West Virginia
No. 2:21-cr-142

———————————————

**Brief of Amicus Curiae Fourth Circuit
Federal Public Defenders in Support
of Appellant and Reversal**

James Wyda
Federal Public Defender

Cullen Macbeth
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
cullen_macbeth@fd.org

Counsel for Amici Curiae

## Table of Contents

Page

Interest of Amici Curiae ............................................................... 1

Introduction ................................................................................ 2

Argument ..................................................................................... 4

   I.  The district court applied an overly permissive historical test ............ 4

     A. When a statute addresses a longstanding societal problem, the government must establish a tradition of "distinctly similar" regulations .................................................................. 4

     B. The district court erred by refusing to apply the proper "distinctly similar" test .................................................................. 7

     C. The district court's "dangerousness" standard is overboard and inconsistent with *Bruen* ...........................................13

   II.  Adopting the "dangerousness" test would plunge courts back into means-end balancing ....................................................... 18

Conclusion ........................................................................... 24

Certificate of Compliance ..................................................... 26

Certificate of Service ............................................................ 27

i

# Table of Authorities

Page(s)

**Federal Cases**

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc) ................................ 23

*Folajtar v. Att'y Gen.*, 980 F.3d 897 (3d Cir. 2020) .......................................... 19, 22

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................ *passim*

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ....................................... 19

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .............................................. 20, 22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) .............................................................. *passim*

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) ....................................... 2, 21

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) ......................................... 21

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ...................................... 2, 20

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ......................................... 19

*United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) ........ 7

*United States v. Reaves*, No. 4:22-cr-224-HEA (E.D. Mo. Jan. 9, 2023) ................ 23

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) ........................................ 21

*United States v. Stevens*, 559 U.S. 460 (2010) .......................................... 18, 19, 20

**Federal Statutes**

18 U.S.C § 921(a)(33) ......................................................................... 9

18 U.S.C. § 922(g)(3) .......................................................................... 21

18 U.S.C. § 922(g)(8) ...................................................................... 21

18 U.S.C. § 922(g)(9).................................................................*passim*

## Historical Statutes

1871 Tex. Gen. Laws § 1................................................................10

2 Edw. 3 c. 3 (1328) ......................................................................14

## Additional Sources

Ruth Bloch, *The American Revolution, Wife Beating, and the Emergent Value of Privacy* (2007) ..............................................................................8

Elaine Foreman Crane, *Witches, Wife Beaters, and Whores: Common Law and Common Folk in Early America* 85 (2011) ....................................7

Clare A. Lyons, *Sex among the Rabble: An Intimate History of Gender and Power in the Age of Revolution, Philadelphia, 1730-1830* (2006) ..........................8

Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn St. L. Rev. 337 (2015) ..........................7

**Interest of Amici Curiae**

Amici are eight Federal Public Defender offices in the Fourth Circuit. Each year, amici collectively represent hundreds of indigent criminal defendants charged with violating various federal gun laws, including 18 U.S.C. § 922(g)(9), the statute at issue in this case. The constitutionality of those statutes is newly in question following the Supreme Court's opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which rejected the test this Court had used to resolve Second Amendment challenges. Amici and their clients therefore have a strong interest in the manner in which this Court interprets and applies *Bruen*, which will control the outcome of Appellant David Nutter's appeal.

No counsel for either party authored this brief in whole or in part. No person other than amici or their offices contributed money that was intended to fund the preparation or submission of this brief. Both parties have consented to the filing of this brief.

## Introduction

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court for the first time interpreted the Second Amendment to protect an individual right to keep and bear arms. Following *Heller*, this Court developed a two-step inquiry for assessing Second Amendment challenges. If, at step one, the Court found that a "challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee," then at step two it would subject the law to either strict or intermediate scrutiny. *United States v. Chester*, 628 F.3d 673, 680, 682-83 (4th Cir. 2010). This latter step involved balancing the government's interest in firearm restrictions against the challenger's interest in keeping and bearing arms. *See, e.g.*, *United States v. Carter*, 669 F.3d 411, 416-17 (4th Cir. 2012). Almost without fail, the product of this balancing was a conclusion that a firearms-restricting statute posed no constitutional problem.

*Bruen* put an end to this practice—or at least it tried to. Rather than balancing means and ends, *Bruen* instructs courts to decide Second Amendment challenges by looking only to "the Second Amendment's plain text" and "this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Means-ends scrutiny is not "administrable," the Court warned, and it inevitably and improperly

2

leads courts to "defer[] to legislative interest balancing," rendering the Second Amendment right illusory. *Id.* at 2130-31.

But old habits die hard. In this case and many others decided over the last seven months, district courts have upheld federal firearms laws by defining America's "historical tradition of firearm regulation" at an extraordinarily high level of generality, e.g., disarmament of groups that a legislature deems "dangerous." That approach ignores *Bruen*'s command that modern firearms regulations must comport with a narrow, "well-defined" historical tradition. *Id.* at 2138. And, because labels like "dangerous" are so malleable, it leaves courts to do exactly what *Bruen* forbids: balance away a fundamental constitutional right by reflexively deferring to legislative judgments about who is "dangerous." The result is "means-end scrutiny under the guise" of a historical inquiry. *Id.* at 2133 n.7.

Under a proper reading of *Bruen*, this Court should conduct a much more targeted analysis. *Bruen* held that when a statute addresses "a general societal problem that has persisted since the 18th century," the government may defend the statute's constitutionality only by demonstrating a robust tradition of "distinctly similar" historical regulations. *Id.* at 2131. It cannot carry its burden merely by showing that the statute is "relevantly similar" to historical analogues, as that less stringent standard is reserved for statutes aimed at "unprecedented"

societal conditions that would have been "unimaginable at the founding." *Id.* at 2132. Here, domestic abusers' access to firearms—the problem at which 18 U.S.C. 922(g)(9) is aimed—has persisted since before the founding, and so the "distinctly similar" test applies. Because neither the district court nor the government has cited any evidence that founding-era legislatures disarmed *domestic abusers* specifically, § 922(g)(9) does not survive "distinctly similar" review. The statute violates the Second Amendment, and this Court should reverse.[1]

## Argument

**I.     The district court applied an overly permissive historical test.**

**A.     When a statute addresses a longstanding societal problem, the government must establish a tradition of "distinctly similar" regulations.**

*Bruen* held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. To rebut the presumption, the government bears the burden of demonstrating that a challenged regulation "is consistent with this Nation's historical tradition of firearm regulation." *Id.* And, crucially, the standard for

---

[1] Unless otherwise indicated, quotations in this brief omit citations, brackets, internal quotation marks, and other characters that do not affect the meaning of the cited language.

reviewing the government's historical evidence varies depending on what kind of problem a statute is intended to remedy—specifically, whether that problem is old or new. Amici refer to these standards as "distinctly similar" and "relevantly similar," as explained below.

In "some cases," where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." *Id.* at 2131. For such statutes, "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added). If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, then the law "[i]s unconstitutional" today. *Id.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* Both *Heller* and *Bruen* fell in this first category: the laws challenged in those cases were aimed at a problem—"handgun violence, primarily in urban areas"—that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Id.*

Conversely, in "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Id.* at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Id.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly similar*." *Id.* (emphasis added). The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified"—what the Court called the "how" and the "why." *Id.* at 2133 (emphasis omitted).

This "relevantly similar" inquiry—which the Court did not undertake in *Bruen*—is less onerous. Unlike the "distinctly similar" standard, it may be satisfied even if the government does not identify "a historical *twin*" or "a dead ringer" for a modern firearm regulation. *Id.* (emphasis in original).[2] But courts may employ the

---

[2] Even when on the "relevantly similar" track, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.*

"relevantly similar" approach only when the challenged statute is geared toward a societal problem that would have been "unimaginable at the founding." *Id.* at 2132. It is not available when the challenged statute "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. At the threshold, therefore, courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes. *Id.* at 2132.

### B.    The district court erred by refusing to apply the proper "distinctly similar" test.

As Mr. Nutter correctly notes, domestic abuse is "'not new.'" Aplt. Br. 26 (quoting *United States v. Perez-Gallan*, 2022 WL 16858516, at *5 (W.D. Tex. Nov. 10, 2022)). Physical abuse of intimate partners long predates the founding, and thus the "general societal problem" addressed by § 922(g)(9)—i.e., domestic abusers' access to guns—"has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131; *see* Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn St. L. Rev. 337, 343-55 (2015) (discussing prevalence of domestic violence in the United States from Puritan New England up through the early 20th century); Elaine Foreman Crane, *Witches, Wife Beaters, and Whores: Common Law and Common Folk in Early America* 85 (2011) (describing the

"pervasiveness of domestic violence" in 17th-century New England); Clare A.

Lyons, *Sex among the Rabble: An Intimate History of Gender and Power in the Age of*

*Revolution, Philadelphia, 1730-1830*, at 45 (2006) (reporting that "domestic

violence" was the "most common justification" for marital dissolutions in the 18th

century); Ruth Bloch, *The American Revolution, Wife Beating, and the Emergent*

*Value of Privacy* (2007) (exploring "the legal treatment of wife beating between the

colonial period and the mid-nineteenth century").

Accordingly, *Bruen* required the district court to apply the "distinctly

similar" standard—not the "relevantly similar" standard—when evaluating

historical evidence that might support § 922(g)(9). The court implicitly

acknowledged as much. It quoted the "distinctly similar" standard from *Bruen*;

conceded that "domestic violence" "was a concern in the founding era" and "has

been a social problem throughout history"; and did not cite *Bruen*'s "relevantly

similar" passage, much less claim it governed Mr. Nutter's case.  J.A.128-29.

Nevertheless, the court did not demand proof that founding-era laws either denied

or substantially abridged the firearms rights of *domestic abusers* specifically, as the

"distinctly similar" standard requires in a challenge to § 922(g)(9). To the extent

the court attempted to justify that decision, its explanations do not hold up under

*Bruen*.

8

*First,* the court noted that "although domestic violence existed" at the founding, "'misdemeanor crime of domestic violence,' as defined in 18 U.S.C §922(g)(9) and § 921(a)(33), did not, limiting the practical availability of similar regulations." J.A.129-30; *see also* J.A.130 ("Laws surrounding domestic violence have evolved."). This misreads *Bruen*, which says the "distinctly similar" test's applicability turns on whether a "*general* societal problem" has existed since the founding. 142 S. Ct. at 2131 (emphasis added). The "general" societal problem addressed by § 922(g)(9) is domestic abusers' access to firearms—not firearms' availability to those who commit crimes that meet the federal code's complicated four-part definition of a "misdemeanor crime of domestic violence." *See* 18 U.S.C. § 921(a)(33)(A)-(B). If the government could evade the "distinctly similar" test by defining a societal problem so narrowly, that test would never apply. It may well be, as the district court observed, that "the legal landscape surrounding crime and punishment was vastly different" in 1791 than it is today. J.A.130. But even so, the "general" societal problem posed by domestic abusers' access to firearms existed both then and now. Nothing more is required to trigger the "distinctly similar" rule.

*Second,* the district court believed that "[t]o suggest that only people convicted of crimes with an exact historical analogue can be subject to gun

restrictions would lead to absurd results." J.A.130. This reasoning misconceives *Bruen*'s holding. When a statute addresses a longstanding societal problem, the government must establish a historical tradition of "*distinctly* similar" precursors—not "*exact[ly]* similar" ones. Although the "distinctly similar" test requires that historical regulations closely approximate a modern law, it does permit minor or modest variations that do not "materially" increase the burden on the right to bear arms. *See* 142 S. Ct. at 2131 (holding statute aimed at longstanding societal problem is unconstitutional if founding generation addressed that problem through "materially different means").

Applying the "distinctly similar" test in *Bruen*, the Court identified only one historical regulation that was sufficiently similar to New York's proper-cause requirement. That 1871 Texas law "forbade anyone from 'carrying on or about his person . . . any pistol . . . unless he ha[d] reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153 (quoting 1871 Tex. Gen. Laws § 1). The Court concluded this statute "support[ed] New York's proper-cause requirement" notwithstanding that the two laws incorporated slightly different standards— "reasonable grounds for fearing an unlawful attack on [one's] person" (Texas) vs. "a special need for self-protection distinguishable from that of the general community" (New York). *Id.* at 2123, 2153. Thus the "distinctly similar" standard

does not require an "exact" historical precursor, J.A.130, but it does require a substantial fit. Here, that means a "well-established and representative" tradition of laws that either disarmed, or substantially infringed the arms-bearing rights of, domestic abusers specifically. *Id.* at 2133. Only laws of that type will satisfy the "fairly straightforward" inquiry embodied by the "distinctly similar" test. *Id.* at 2131.

Below, the government, like the district court, recognized that "where a modern regulation addresses 'a general societal problem that has persisted since the 18th century,'" courts should demand evidence of "distinctly similar" historical regulations. J.A.110 (quoting *Bruen*, 142 S. Ct. at 2131). The government likewise acknowledged that "domestic violence has long been recognized as a problem." J.A.111. And, like the district court, it nevertheless attempted to sidestep the rigor of the "distinctly similar" requirement. Specifically, the government argued that the danger posed by domestic abusers' access to guns "may not have existed to the same degree in 1791," by which it apparently meant that more people use guns to attack intimate partners today than in 1791. J.A.111. But even if the government substantiated that claim, it would not be enough to relieve the government of its "distinctly similar" burden. If it were, *Bruen* would have come out differently.

The Court described the "general societal problem" in *Bruen* as "firearm violence in densely populated communities." *Id.* at 2131. That problem has undoubtedly gotten worse since the Second Amendment was ratified. As New York City explained to the Court in its *Bruen* amicus brief, the firearms that were accessible to New Yorkers in 1791 were mostly "single-shot muzzle-loading long guns" that "were bulky, largely unreliable, and relatively inaccurate." Brief for City of New York as Amicus Curiae 9. But "[w]ith advances in firearms and manufacturing technology" beginning in the mid-19th century, "easily concealable and reliable handguns capable of being carried loaded and firing multiple shots became readily available." *Id.* at 12. These technological advances, coupled with a population boom, led to "a corresponding rise in gangs, violent crime, and urban riots" in New York City, which in turn caused "an acute rise in gun deaths." *Id.* at 13. It was these changes that prompted New York to enact its proper-cause requirement. *Id.* at 13-19. Yet despite the increased frequency and deadliness of gun crime in New York City, the *Bruen* Court applied the "distinctly similar" standard, not the more permissive "relevantly similar" standard.

So even if domestic gun violence is more prevalent and more deadly today, the government still must point to a "well-established and representative" tradition of laws "distinctly similar" to § 922(g)(9). *Bruen*, 142 S. Ct. at 2131, 2133.

12

Neither the government nor the district identified any such laws from the founding era. Section 922(g)(9) is therefore unconstitutional.

### C. The district court's "dangerousness" standard is overbroad and inconsistent with *Bruen*.

Unable to cite any founding-era laws that denied firearms to domestic abusers specifically, the district court claimed § 922(g)(9) is part of a (supposed) tradition of laws disarming "dangerous" groups. *See* J.A.132 ("[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety."), J.A.134 ("[A]ny person viewed as potentially dangerous could be disarmed by the government without running afoul of the 'right to bear arms.'"). The district court arrived at its "dangerousness" classification by citing a handful of colonial and early-republic statutes that made it illegal for slaves, free Blacks, Native Americans, and certain religious minorities to possess firearms, as well as a small number of statutes that conditioned firearm rights on citizens' willingness to swear a loyalty oath to the state. J.A.132, 136. Based on these disparate regulations of discrete groups, the court deduced a broader principle: that the Second Amendment, as it was understood in 1791, did not protect members of *any* group considered "dangerous," even if that specific group was never disarmed at the founding. *See* J.A.132-136.

13

*Bruen* does not permit courts to describe a historical tradition of regulation at so high a level of generality. Rather, it teaches that in carving out exceptions to "the Second Amendment's unqualified command," *Bruen*, 142 S. Ct. at 2126, courts should proceed cautiously, characterizing those exceptions as narrowly and concretely as possible to ensure they are in fact consistent with America's historical tradition of firearms regulation. *Bruen* modeled this cautious approach. To support its proper-cause requirement, New York relied on a number of English and early American firearms regulations that, in its view, demonstrated a "sweeping" governmental power to enact "broad prohibitions on all forms of public carry." *Id.* at 2139, 2145. The Court, however, read each of these laws narrowly, as imposing only limited and specific restrictions on public carry, and it refused to treat them as more than the sum of their parts.

**The Statute of Northampton.** First, New York cited the 1328 Statute of Northampton, which "provided that, with some exceptions, Englishmen could not 'come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere.'" *Id.* at 2139 (quoting 2 Edw. 3 c. 3 (1328)). New York pointed as well to two 17th-century colonial statutes, three

14

states' "late-18th-century and early-19th-century statutes," and several states' "common-law offenses of 'affray,'" all of which prohibited conduct similar to the Statute of Northampton. *Id.* at 2142-46. The Court read these laws as prohibiting only "bearing arms in a way that spreads 'fear' or 'terror' among the people"— not as a license for broader, more "onerous" public-carry restrictions. *Id.* at 2139, 2145.

**Concealed-carry bans.** Second, New York cited several statutes from "the early to mid-19th century" that "proscribed the concealed carry of pistols and other small weapons" in public. *Id.* at 2146. The Court, however, stressed these laws' limited reach, noting that antebellum courts had held "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry." *Id.* (emphasis in original).

**Surety statutes.** Third, New York likened its proper-cause requirement to mid-19th-century surety statutes, which "required any person who was reasonably likely to 'breach the peace,' and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Id.* at 2148. Once again, the Court highlighted how narrowly surety statutes infringed the right to keep and bear arms. Those laws "were not *bans* on public carry," the Court

15

explained, but instead "*presumed* that individuals had a right to public carry that could be burdened only" in limited circumstances. *Id.* (emphasis in original).

**Sensitive places.** Finally, New York attempted to fit its proper-cause requirement into the "sensitive places" doctrine, which marks off certain areas where firearms can be "altogether prohibited . . . consistent with the Second Amendment." *Id.* at 2133. But the Court said that doctrine applies to "relatively few" places, e.g., legislative assemblies, polling places, and courthouses. *Id.* The Court found no historical support for stretching it to reach "all 'places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available,'" as New York urged. *Id.* New York, the Court wrote, sought to "define[] the category of 'sensitive places' far too broadly." *Id.* at 2134.

Summarizing this evidence, the Court concluded Anglo-American history revealed a small number of "well-defined" restrictions on public carry: those that limited "the intent for which one could carry arms" (to terrorize the people), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied or in a "sensitive place"). *Id.* at 2138. But that's all. From the fact that founding-era laws prohibited "particular mode[s]" of public carry, the Court declined to conclude that

legislatures may enact a "*general* prohibition" on *all* modes of public carry or may "ban public carry altogether." *Id.* at 2146-47 & n.19 (emphasis altered). New York, in other words, could not derive a general, far-reaching power to proscribe public carry simply by cobbling together a handful of discrete, targeted laws that regulated public carry in limited and specific ways. That governments could historically impose particular public-carry restrictions does not mean they can "broadly prohibit[]" public carry today. *Id.* at 2156.

For the same reason, the district court erred by excluding all supposedly "dangerous" groups from the Second Amendment's protections. Relying on a handful of founding-era statutes disarming specific groups (slaves, free Blacks, Native Americans, certain religious minorities, and disloyal subjects), the court extrapolated the much broader principle that "dangerous" groups, in general, do not enjoy the right to keep and bear arms. But this is exactly the maneuver the Court rejected in *Bruen*: identify a few specific examples of conduct that historically has been constitutionally unprotected (e.g., carrying firearms "to terrorize the people," carrying concealed in states where open carry is permitted), move up the level-of-generality ladder to a descriptor that unites these discrete examples (e.g., "public carry"), and then apply that umbrella term to *all* conduct that (arguably) falls in the broader category (e.g., publicly carrying without "proper

17

cause"). *Bruen* forbids the government from abridging fundamental constitutional rights in such an indiscriminate, scattershot fashion.

"Dangerousness" is not the proper metric for parsing the historical record.

## II.    Adopting the "dangerousness" test would plunge courts back into means-ends balancing.

*Bruen* rejected means-ends balancing not only because it "is inconsistent with *Heller*'s historical approach," 142 S. Ct. at 2129, but also for two more practical reasons: (1) hewing closely to history is "more administrable[] than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions," and (2) in practice, courts employing means-ends scrutiny had too often "defer[red] to the determinations of legislatures," rather than honoring the balance "struck by the traditions of the American people," *id.* at 2131. Analyzing Second Amendment claims under the "dangerousness" rubric will inevitably devolve into means-ends balancing by another name, reproducing the very dangers *Bruen* sought to avoid by limiting courts to "text and history." *Id.* at 2129.

To begin, *Bruen* instructs that Second Amendment exceptions must be "well-defined and narrowly limited." *United States v. Stevens*, 559 U.S. 460, 468-49 (2010) (discussing how Supreme Court has crafted First Amendment exceptions, to which *Bruen* analogized process of articulating Second Amendment exceptions,

*see* 142 S. Ct. at 2130 (citing *Stevens*)); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.11 (3d Cir. 2021) (explaining Supreme Court has "strong preference for 'well-defined and narrowly limited' exceptions" in Second Amendment context) (quoting *Stevens*, 559 U.S. at 468-69); *Bruen*, 142 S. Ct. at 2156 ("well-defined"). The category of "dangerous" persons, however, is anything but "well-defined and narrowly limited." "Dangerous" is an elastic, malleable term—"a mushy standard that sets no limit." *Cf. Folajtar v. Att'y Gen.*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) (arguing "the felony label" fails to constrain legislatures). If a misdemeanor crime of domestic violence renders one "dangerous," as the district court held, "[w]hy not all misdemeanors? Why not minor infractions?" *United States v. Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring). What about someone who has been found liable of a civil violation? Or who, on a single occasion, was stopped for speeding but let go with a warning?

The "dangerousness" label, moreover, need not be limited to those who violate the law. It is the kind of "unbounded" and "manipulable" term that, in the wrong hands, could be applied to virtually any group of people. *Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting) ("felony"). Wielding the "dangerous" designation, for instance, a legislature might seek to disarm supporters of an opposing political party, those with a low IQ or intellectual disability, people who get less than five

19

hours' sleep a night, or inhabitants of "high-crime" areas. And as the district court noted, several colonial and early-republic legislatures apparently disarmed slaves and Native Americans because of their perceived dangerousness. Of course, "race-based exclusions would be unconstitutional today" under the Equal Protection Clause. *Kanter v. Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting). Still, these odious founding-era laws illustrate how easily legislatures can manipulate a term like "dangerous" to deny fundamental constitutional rights to disempowered and disfavored groups. *See Stevens*, 559 U.S. at 472 (forbidding government to use "highly manipulable" tests to limit First Amendment rights, to which *Bruen* equated limitations on Second Amendment rights).

Given these difficulties, courts will have to devise some metric for deciding which supposedly "dangerous" people can and cannot be disarmed. But there is no principled way to do that without engaging in the "judge-empowering interest-balancing inquiry" that *Bruen* repudiated. 142 S. Ct. at 2129. Evaluating whether a particular group can be disarmed on "dangerousness" grounds will involve appraising how "important [that] object" is, and whether a challenged statute "reasonabl[y] fit[s]" that goal. *Chester*, 628 F.3d at 683. This is the bread and butter of pre-*Bruen* interest-balancing. At bottom, in fact, this Court's post-*Heller* § 922(g) cases did little more than ask whether Congress had a legitimate basis for

20

believing certain people were too "dangerous" to be entrusted with firearms. *See, e.g.*, *United States v. Chapman*, 666 F.3d 220, 228-31 (4th Cir. 2012) (upholding 18 U.S.C. § 922(g)(8), which bars firearm possession by those subject to intimate-partner restraining orders, because Congress "reasonabl[y]" concluded members of that "narrow" class would pose a "danger" to others if permitted to possess firearms); *Carter*, 669 F.3d at 417-20 (indicating Court would uphold 18 U.S.C. § 922(g)(3), which bars firearm possession by "unlawful users" of illegal drugs, if "empirical evidence" and "simple common sense" showed that drug users "are sufficiently dangerous to require disarming them").

The district court's opinion in this case proves the point. The court defended its decision to affix the "dangerous" label to domestic-violence misdemeanants by adopting the reasoning of *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011)—in which this Court upheld § 922(g)(9) through means-ends balancing. J.A.133 (asserting Congress' judgment about domestic-violence misdemeanants "is well supported by empirical evidence and statistics regarding domestic violence, recidivism by those convicted of misdemeanor crimes of domestic violence, and increased risks of serious harm and death posed when firearms are present in connection with domestic violence"). A "dangerousness"-based historical approach, therefore, is no more "administrable" than the means-

ends balancing *Bruen* disavowed, and embracing that approach would simply

reinstate "means-end scrutiny under the guise" of a historical approach—an

outcome *Bruen* expressly warned against. *Id.* at 2130, 2133 n.7.

The only way out of this morass is to adopt a posture of maximum deference:

if the legislature deems certain groups "dangerous," and therefore unentitled to

bear arms, its word is final. But that approach cannot be reconciled with *Bruen*,

which admonishes that judicial "defer[ence] to the determinations of legislatures"

"is not" "appropriate" in Second Amendment litigation. *Id.* at 2131. The Court in

*Bruen* refused to "define[ a] category" of Second Amendment exceptions in a way

that would permit legislatures to "eviscerate" the right to keep and bear arms

based on nothing more than their own say-so. *Id.* at 2134 (addressing sensitive

places). In no other context do courts allow legislatures to deny enumerated

constitutional rights at will, and taking that approach here would render the Second

Amendment "a second-class right." *Id.* at 2156.

This Court "must not reflexively defer to [a] label when a fundamental right

is at stake," especially when that label is so "unbounded." *See Folajtar*, 980 F.3d at

912, 921 (Bibas, J., dissenting) (criticizing capaciousness of "felony"); *Kanter*, 919

F.3d at 465 (Barrett, J., dissenting) ("The government could quickly swallow the

right if it had broad power to designate any group as dangerous and thereby

disqualify its members from having a gun."); *cf. United States v. Reaves*, No. 4:22-cr-224-HEA, ECF No. 55 at 18 (E.D. Mo. Jan. 9, 2023) (allowing government to tack "disloyal" or "unvirtuous" label on any group it chooses would "cede too much legislative control over who may and who may not possess a firearm for self-defense" and "relegate the Second Amendment [to] second class status").

For purposes of delineating exceptions to "the Second Amendment's unqualified command," *Bruen*, 142 S. Ct. at 2126, "dangerousness" is a bankrupt concept. A rule based on "dangerousness" is doomed to fail, embroiling courts in indeterminate means-ends balancing or forcing them to "defer blindly" to legislatures—neither of which is compatible with *Bruen. Binderup v. Att'y Gen.*, 836 F.3d 336, 351 (3d Cir. 2016) (en banc). To avoid these pitfalls, the Court should apply the proper "distinctly similar" standard demanded by *Bruen*.

**Conclusion**

The government did not bring forward, and the district court did not cite, evidence demonstrating a historical tradition of statutes "distinctly similar" to § 922(g)(9). This Court should therefore reverse with instructions to dismiss the indictment.

James Wyda
Federal Public Defender

Cullen Macbeth
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600

/s/ Cullen Macbeth
Cullen Macbeth

On behalf of:

William F. Nettles, IV
Federal Public Defender
District of South Carolina
1901 Assembly Street
Suite 200
Columbia, SC 29201

G. Alan Dubois
Federal Public Defender
Eastern District of North Carolina
150 Fayetteville Street
Suite 450
Raleigh, NC 27601

Louis Allen
Federal Public Defender
Middle District of North Carolina
301 N. Elm Street
Suite 410
Greensboro, NC 27401

Geremy Kamens
Federal Public Defender
Eastern District of Virginia
1650 King Street
Suite 500
Alexandria, VA 22314

Juval O. Scott
Federal Public Defender
Western District of Virginia
210 First Street, SW
Suite 400
Roanoke, VA 24011

Brian J. Kornbrath
Federal Public Defender
Northern District of West Virginia
230 West Pike Street
Suite 360
Clarksburg, WV 26301

John Baker
Federal Public Defender
Western District of North Carolina
129 West Trade Street
Suite 300
Charlotte, NC 28202

## Certificate of Compliance

1. This brief has been prepared in Microsoft Word using 14-point,

   proportionally spaced, serif typeface.

2. Excluding the items identified in Federal Rule of Appellate Procedure 32(f),

   this brief contains 4,705 words.

/s/ Cullen Macbeth
Cullen Macbeth
Assistant Federal Public Defender

**Certificate of Service**

I certify that on January 13, 2023, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Cullen Macbeth
Cullen Macbeth
Assistant Federal Public Defender