No. 22-4541

In the
# United States Court of Appeals
for the Fourth Circuit

———————————

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID KEITH NUTTER,

Appellant.

———————————

Appeal from the United States District Court
for the Southern District of West Virginia
*The Honorable Irene C. Berger, United States District Judge*

———————————

Brief of Appellee the United States of America

———————————

WILLIAM S. THOMPSON
United States Attorney

ANDREW J. TESSMAN
Assistant United States Attorney
300 Virginia Street, E., Room 4000
Charleston, West Virginia 25301
(304) 345-2200

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iii

STATEMENT OF JURISDICTION .....................................................1

ISSUE PRESENTED .............................................................................1

STATEMENT OF THE CASE ..............................................................1

    A.    Prior domestic violence convictions and offense conduct ...........1

    B.    Indictment, pretrial motions, and guilty plea.............................2

    C.    Post-*Bruen* litigation and sentencing ............................................3

SUMMARY OF ARGUMENT .............................................................5

ARGUMENT

    Section 922(g)(9) remains constitutional under the framework established in *Bruen* ...............................................................7

    A.    Standard of Review ....................................................................7

    B.    The *Bruen* Decision ...................................................................8

        1.    This Court previously upheld § 922(g)(9) under the now invalidated second step of its two-step approach ...................8

        2.    *Bruen* invalidated the second step of this Court's two-step approach and clarified the standard for analyzing Second Amendment challenges ...........................................11

        3.    Federal courts have unanimously held that § 922(g)(9) is constitutional under *Bruen* .................................................15

i

C.      Post-*Bruen* Analysis of § 922(g)(9) ................................. 16

    1.  Nutter is not part of the law-abiding populace protected by the Second Amendment ................................. 16

        a.  The Second Amendment protects the rights of law-abiding, responsible citizens ................................. 16

        b.  Those who have been convicted of a misdemeanor crime of domestic violence are not law-abiding citizens protected by the Second Amendment ................................. 18

        c.  Nutter is not a law-abiding person ................................. 19

    2.  In any event, § 922(g)(9) is consistent with the historical tradition of firearm regulation ................................. 20

        a.  Section 922(g)(9) is analogous to historical laws disarming people for crimes committed ................................. 21

        b.  Section 922(g)(9) is analogous to historical laws that categorically disarmed persons adjudged to be dangerous to the community ................................. 26

        c.  Section 922(g)(9) is analogous to historical surety laws, which were frequently used to protect abused spouses ................................. 32

    3.  The 5th Circuit's recent decision in *Rahimi* invalidating § 922(g)(8) is inapposite ................................. 36

CONCLUSION ................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Baze v. Rees,*
    553 U.S. 35 (2008) ...................................................................... 22

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) ........................................................... 8, 20

*Clark v. Community for Creative Non-Violence,*
    468 U.S. 288 (1984) ...................................................................... 7

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .............................................................. passim

*Folajtar v. Attorney General of the U.S.,*
    980 F.3d 897 (3d Cir. 2020) ................................................... 22, 28

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ....................................................... 28

*King v. Lord Lee,*
    83 Eng. Rep. 482 (K.B. ca 1975) ............................................... 34

*McDonald v. Chicago,*
    561 U.S. 742 (2010) ..................................................... 8, 11-13, 16

*Medina v. Whitaker,*
    913 F.3d 152 (D.C. Cir. 2019).............................................. 21, 25

*Nat'l Rifle Assoc. of Amer., Inc. v. Bureau of Alcohol, Tobacco, Firearms &*
    *Explosives,* 700 F.3d 185 (5th Cir. 2012) ................................... 27

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) .......................................................... passim

*Range v. Attorney General,*
    53 F.4th 262 (3d Cir. 2022), *vacated upon granting of rehearing en banc,* 2023
    WL 118469 (Jan. 6, 2023) ........................................................... 30

*State v. Davis,*
    3 Brev. 5 S.C.L. 3 (S.C. Const. Ct. App. 1811) .................................................... 35

*United States v. Belless,*
    338 F.3d 1063 (9th Cir. 2003) ......................................................................... 30

*United States v. Bernard,*
    Case No. 1:22-cr-3, 2022 WL 17416681 (N.D. Iowa Dec. 5, 2022) .................... 15

*United States v. Castleman,*
    572 U.S. 157 (2014) ................................................................................ 30, 31

*United States v. Chester,*
    628 F.3d 673 (4th Cir. 2010) .................................................. 8-10, 12, 19

*United States v. Chester,*
    514 F. App'x 393 (4th Cir. 2013) ................................................... 9, 10

*United States v. Farley,*
    Case No. 3:22-cr-30022, Dkt. No. 23 (C.D. Ill. Feb. 8, 2023) .......................... 15

*United States v. Gleaves,*
    Case No. 3:22-cr-14, Dkt. No. 116 (M.D. Tenn. Feb. 6, 2023) .......................... 15

*United States v. Hammond,*
    Case No. 4:22-cr-177, Dkt. No. 38 (S.D. Iowa Feb. 15, 2023) .......................... 15

*United States v. Jackson,*
    Case No. 5:22-cr-59, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022) ............... 15

*United States v. King,*
    Case No. 5:22-cr-488, Dkt. No. 33 (W.D. Okla. March 9, 2023) ....................... 15

*United States v. Malloy,*
    568 F.3d 166 (4th Cir. 2009) ............................................................................. 7

*United States v. Martinez,*
    Case No. 3:17-cr-257, Dkt. No. 121 (N.D. Cal. Feb. 2, 2023) .......................... 15

iv

*United States v.Rahimi,*
  ___ F. 4th ___, 2023, WL 2317796 (5th Cir. 2023) ................................. 36, 37

*United States v. Salerno,*
  481 U.S. 739  (1987) ................................................................................... 7

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ..................................................................... 28

*United States v. Staten,*
  666 F.3d 154 (4th Cir. 2011) ................................................................ 10, 12

*Young v. Hawaii,*
  992 F.3d 765 (9th Cir. 2021) ..................................................................... 32

**Statutes**

18 U.S.C. § 921(a)(33)(A) ............................................................................ 19-21

18 U.S.C. § 922(g)(8) ..................................................................................... 36, 37

18 U.S.C. § 922(g)(9) .................................................................................. passim

18 U.S.C. § 3231 ................................................................................................. 1

18 U.S.C. § 3742 ................................................................................................. 1

28 U.S.C. § 1291 ................................................................................................. 1

Mass. Rev. Stat. ch. 134 § 16 (1836)  ........................................................... 34

Ohio Rev. Code Ann. § 2919.22 ...................................................................... 1

Ohio Rev. Code Ann. § 2919.25 ...................................................................... 1

W. V. Code § 61-7-7 .......................................................................................... 18

## Rules

Fed. R. App. P. 4(b)(1)(A)(i) ........................................................... 1

## Other

1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52-53 (1869) ................................................................ 33

1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811) .......................................................... 25

2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) (1886) ......................................................... 23

2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896) ...................... 24

3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878) ................................................................ 25

4 William Blackstone, *Commentaries on the Laws of England* (1st ed. 1769)......... 21, 32

9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821).............. 24

142 Cong. Rec. 22985, 22986 (1996) .................................................... 30

Acts and Laws of His Majesty's Province of New Hampshire in New England 1 (1759)........................................................................ 33

Acts and Laws of The English Colony of Rhode Island and Providence Plantations in New-England in America 33-34 (1767)........................................ 25

An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790) ............................................................. 22

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014)...... 22

Bureau of Justice Statistics, *Homicide Trends in the United States, 1980-2008, 10* (Table 6) (November 2011) https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf ........................................... 31

Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn. State L. Rev. 337, 344 (2015) ........................................... 35

Don B. Kates, Jr., *The Second Amend.: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986) ................................................................. 29

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249 (2020) ........................................... 26

Joyce Lee Malcolm, *To Keep and Bear Arms at 140-41 (1994)* ................................... 27

Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) ............................................. 26

Natalie Nanasi, *Disarming Domestic Abusers*, 14 Harv. L. & Pol'y Rev. 559 (2020) ................................................................................. 31

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007) ........................................................... 27, 29

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) ...................................... 27

Stuart Banner, *The Death Penalty: An American History* (2002) ................................... 22

Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and the Powers of Courts of Chancery 65-66* (New Haven, Oliver Steele 1816) ........................................................... 34

## STATEMENT OF JURISDICTION

Defendant–Appellant David Keith Nutter appeals from a judgment of conviction in a criminal case. The district court had jurisdiction under 18 U.S.C. § 3231 and entered judgment on September 15, 2022. JA187. Nutter filed a timely notice of appeal on September 21, 2022. JA195; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction to review the judgment of conviction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## ISSUE PRESENTED

Whether 18 U.S.C. § 922(g)(9)'s prohibition on possession of a firearm by a person who has been convicted of domestic violence violates the Second Amendment.

## STATEMENT OF THE CASE

### A.     Prior domestic violence convictions and offense conduct.

In 1998, Nutter was convicted in Stark County, Ohio, of domestic violence against a family or household member, in violation of Ohio Rev. Code Ann. § 2919.25, after striking and causing physical harm to his then-sixteen-year-old stepdaughter. JA39. In 2002, Nutter was convicted again in Stark County, Ohio, of domestic violence against a family or household member under Ohio Rev. Code Ann. § 2919.25, as well as child abuse under Ohio Rev. Code Ann. § 2919.22, after striking the seven-month-old child of his girlfriend, with whom he resided, in the chest and upper leg area when he threw a full can of beer. JA40. He then pushed his girlfriend

with enough force to leave a red bruise on her sternum and cause her to fall back onto her other child. JA40.

In July 2019, the Nicholas County Sheriff's Department began investigating Nutter after interviewing two minors who had run away from home. JA124. The minors told police that a friend took them to Nutter's home on the Fourth of July. JA124. The minors reported that they consumed alcohol supplied by Nutter while at his house and Nutter recklessly waved around loaded firearms while intoxicated. JA124. He then fired the guns behind the house before his daughter hid the guns from him. JA124. Deputies executed a search warrant for Nutter's residence on July 6, 2019, and seized two rifles, two shotguns, three muzzleloader pistols, and assorted ammunition. JA124.

## B. Indictment, pretrial motions, and guilty plea.

A grand jury charged Nutter with one count of possession of a firearm by a person previously convicted of misdemeanor crimes of domestic violence, in violation of 18 U.S.C. § 922(g)(9), alleging that Nutter possessed four firearms. JA8-9.

On May 2, 2022, Nutter filed a motion to dismiss the Indictment arguing, in part, that § 922(g)(9) was unconstitutional as applied to him due to the age of his prior convictions. JA10-15. The district court denied the motion to dismiss in a memorandum opinion and order dated May 17, 2022. JA49-57. The district court

applied then-binding Fourth Circuit precedent and held, among other things, that §

922(g)(9) was constitutional as applied to Nutter. JA55-57. In so holding, the district

court applied intermediate scrutiny and concluded that the government had carried

its burden of establishing that reducing domestic gun violence is a substantial

government objective. JA55-57.

On June 9, 2022, Nutter pleaded guilty to a violation of § 922(g)(9) with a

conditional plea agreement preserving his right to appeal the district court's ruling on

the motion to dismiss. JA58-101. Nutter admitted that he possessed the four firearms

on July 6, 2019, and that he knew he had been convicted of prior misdemeanor crimes

of domestic violence. JA100-101.

### C.     Post-*Bruen* litigation and sentencing.

Two weeks later and before judgment was entered in Nutter's case, the United

States Supreme Court issued its decision in *New York State Rifle & Pistol Ass'n, Inc. v.*

*Bruen*, 142 S. Ct. 2111 (2022).  Among other things, *Bruen* held that means-end

scrutiny, such as strict or intermediate scrutiny, does not apply in the Second

Amendment context. *See id.* at 2127-30.  Instead, when a firearms regulation burdens

Second Amendment rights, "the government must demonstrate that the regulation is

consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.

3

The *Bruen* decision prompted Nutter to file a second motion to dismiss asking the district court to reconsider its prior order and find that § 922(g)(9) was unconstitutional now that the intermediate scrutiny analysis applied previously had been abrogated. JA102-105.

On August 19, 2022, the district court denied Nutter's "*Bruen*-based" motion to dismiss in a memorandum opinion and order. JA122-137. The district court held that the prohibition on possession of a firearm by domestic abusers, like Nutter, does not violate the Second Amendment. JA129-137. Because "the historical record" reflected "significant regulation of firearms designed to ensure responsible and safe gun ownership," the prohibition on possession of firearms by domestic abusers fit "easily" within the legal framework designed to keep firearms away from dangerous people. JA132-133.

Referring to the text of the Second Amendment, the district court found that "[i]ndividuals who pose a threat to the safety of their families, and potentially others, would not have been welcome as part of a 'well-regulated' militia and permitting them to possess firearms runs starkly counter to public safety goals of the Second Amendment." JA133.

The district court reasoned that "key" to the historical understanding of the Second Amendment was the "distinction between regulations that impact everyone

4

and those that impact discrete groups found to pose a danger to the public." JA134.

A law prohibiting a domestic abuser from possessing a firearm restricted "only those found, following due process, to pose a special danger of misusing firearms based on their own actions." JA135.   Nothing in the historical record suggested a popular understanding of the Second Amendment at the time of the founding that "extended to preserving gun rights for groups who pose a particular risk of using firearms against innocent people." JA137.

On September 15, 2022, the district court sentenced Nutter to 12 months of imprisonment, to be followed by three years of supervised release. JA138-177; JA187-189.

## SUMMARY OF ARGUMENT

Section 922(g)(9) remains constitutional after *Bruen*. That decision clarified that, where a regulation burdens conduct within the scope of the Second Amendment's plain language, the government must show that the challenged regulation is consistent with the nation's historical tradition of firearm regulation. Section 922(g)(9) is constitutional under that test.

The conduct burdened by § 922(g)(9)—that is, the possession of firearms by those previously convicted of a misdemeanor crime of domestic violence—does not fall within the scope of the Second Amendment right, which protects only the right of

law-abiding, responsible citizens to possess firearms for self-defense. Individuals subject to § 922(g)(9) are not responsible or law-abiding as they have been previously convicted, after due process, of the use of physical force or threatened use of a deadly weapon in a domestic relationship. Such conduct will always show lack of responsibility and a dangerous, violent unwillingness to abide by the law. That is certainly the case here, where Nutter's prior convictions involved striking and injuring at least two children and violently pushing his girlfriend. Nutter does not fall within "the people" protected by the text of the Second Amendment, and thus he has no right at all that is burdened by § 922(g)(9).

Moreover, even if those convicted of misdemeanor crimes of domestic violence are presumed to fall under the protections of the Second Amendment, the disarmament of such individuals is consistent with the historical tradition. There is a long tradition both in England and in the United States of prohibiting firearm possession by those who pose a threat to the community. Section 922(g)(9) is analogous to those laws both in the burden it imposes and in the reasons for that burden. Section 922(g)(9) is also analogous to historical surety laws, which allowed a person to obtain a "surety of the peace," including potential disarmament, when another person posed a threat to his or her safety. Because § 922(g)(9) is consistent with the historical tradition, it is constitutional.

# ARGUMENT

**Section 922(g)(9) remains constitutional under the framework established in *Bruen.***

A.     *Standard of Review*

"This court reviews a challenge to the constitutionality of a federal statute *de novo*." *United States v. Malloy*, 568 F.3d 166, 171 (4th Cir. 2009). Because Nutter argues that § 922(g)(9) is unconstitutional on its face, he "must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As the party challenging the statute's constitutionality, he bears the initial burden of showing that his conduct is protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2130 (analogizing to the First Amendment); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies."). And, even if Nutter meets this burden and the burden shifts to the government of showing that § 922(g)(9) is consistent with historical firearm regulations, *see Bruen*, 142 S. Ct. at 2130, the government can defeat Nutter's facial challenge by showing that the statute is constitutional in any of its applications. *See*

7

*Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019) (a facial challenge requires showing that the law "is unconstitutional in all its applications").

### B.  The Bruen Decision

1.  *This Court previously upheld § 922(g)(9) under the now invalidated second step of its two-step approach.*

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense.  And in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Court held that this right applies to the states through the Fourteenth Amendment.

After *Heller*, this Court addressed the constitutionality of § 922(g)(9) and adopted a "two-part approach to Second Amendment claims."  *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("*Chester II*").[1]  Under the first step, the Court undertook a "historical inquiry" that asked "whether the conduct at issue was understood to be within the scope of the right at the time of ratification."  *Id.*  "If the

---

[1] Before *Chester II*, the Fourth Circuit remanded a district court decision upholding the constitutionality of § 922(g)(9) when it failed to determine the most appropriate level of scrutiny and apply it to its analysis. *See United States v. Chester*, 367 F. App'x 392, 393–94 (4th Cir.), *opinion vacated on reh'g*, 628 F.3d 673 (4th Cir. 2010) (*Chester I*). However, *Chester I* was vacated upon rehearing in *Chester II*.  *See Chester*, 628 F.3d at 673.

challenged regulation burden[ed] conduct that was within the scope of the Second Amendment as historically understood," the Court "move[d] to the second step of applying an appropriate form of means-end scrutiny." *Id.*

In *Chester II*, this Court was not presented with historical evidence that persons convicted of a domestic violence misdemeanor were wholly unprotected by the Second Amendment. *Id.* at 681. Therefore, this Court was unable to determine whether "the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors." *Id.* Absent such historical evidence, this Court assumed—but explicitly did not decide—that Chester's "Second Amendment rights [we]re intact and that he [wa]s entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense." *Id.* at 681–82. This Court then went on to establish the appropriate post-*Heller* standard of review for Second Amendment challenges (intermediate scrutiny) and remanded the case to apply that standard. *Id.* at 683.

The *Chester* case returned to this Court in 2013, and this Court affirmed a district court decision upholding the constitutionality of § 922(g)(9) after applying intermediate scrutiny to the defendant's challenge. *United States v. Chester*, 514 F. App'x 393, 394 (4th Cir. 2013) ("*Chester III*"). Like in *Chester II*, this Court did not conduct a "historical inquiry." *See id.*

Before *Chester III*, this Court had already held in *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) that § 922(g)(9) reasonably fit a substantial government objective and thus survived intermediate scrutiny. Similar to *Chester II*, this Court in *Staten* did not consider whether possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment as historically understood even though the government had presented evidence of laws from England and the colonies prior to the American Revolution in support of the proposition. *See id.* at 160. Instead, this Court determined that the "historical inquiry" was unnecessary because the government had carried its burden that § 922(g)(9) satisfies the intermediate scrutiny standard. *See id.* at 160-68.[2]

---

[2] The Fourth Circuit has expressly recognized that certain groups of non-law-abiding individuals (e.g., felons, violent criminals, undocumented aliens) are not entitled to Second Amendment protection. *See, e.g., United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."); *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012) ("However the Supreme Court may come to define a 'law-abiding responsible citizen' for Second Amendment purposes, Moore surely would not fall within that group" because of his prior convictions for robbery and assault). These decisions did not rely on the means-end scrutiny test, but rather are consistent with the text-and-history analysis under *Bruen.*

10

     2.     *Bruen invalidated the second step of this Court's two-step approach and clarified the standard for analyzing Second Amendment challenges.*

In *Bruen*, the Supreme Court invalidated the means-end scrutiny previously applied by this Court and clarified the standard for analyzing Second Amendment constitutional challenges. The Supreme Court held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *New York State Rifle & Pistol Ass'n, Inc.* v. *Bruen*, 142 S. Ct. 2111, 2122 (2022). *Bruen* observed that, after *Heller*, the courts of appeals had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 2125. *Bruen* observed that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. But *Bruen* "decline[d] to adopt" the second step of that framework, holding that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 2126-27. Instead, a regulation that burdens the right of ordinary, law-abiding citizens to keep and carry firearms for self-defense passes constitutional muster only if it is consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* "unequivocally overrule[d]" the second step of this Court's two-step Second Amendment analysis. *Bruen* held that the "predominant framework['s]"

second step "is one step too many" and "is inconsistent with *Heller's* historical approach and its rejection of means-end scrutiny." *Bruen*, 142 S. Ct. at 2127, 2129. Thus, *Bruen* abrogates the analysis set forth in *Chester II* and applied in *Staten* to uphold § 922(g)(9), and this Court must re-evaluate whether § 922(g)(9) is constitutional under the test that *Bruen* articulates.

While *Bruen* struck down the means-end scrutiny applied by courts after *Heller*, it left much of *Heller* and *McDonald* intact. In *Heller*, the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller*, 554 U.S. at 635. But *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. *Heller* said that "nothing in [its] opinion should be taken to cast doubt" on certain "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places," and "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26. In *McDonald*, a plurality of the Court again emphasized that applying the amendment to the states "does not imperil every law regulating firearms." *McDonald*, 561 U.S. at 786 (opinion of Alito, J.).

12

*Bruen* does not call into question *Heller*'s statements regarding permissible regulations on firearm possession. Justice Alito explained in concurrence that *Bruen* does not "disturb[ ] anything that [the Court] said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at 2157 (Alito. J., concurring). While *Bruen* struck down a New York license-to-carry law that "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms," it did not render the protections of the Second Amendment limitless. *Id.* at 2156. As Justice Kavanaugh (joined by the Chief Justice) emphasized in concurrence, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

Rather than abrogating *Heller* and *McDonald*, *Bruen* simply clarified the "standard for applying the Second Amendment." *Bruen*, 142 S. Ct. at 2129. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129-30. Second, when the conduct is protected, "[t]he government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

13

The Court explained that, "[i]n some cases," the inquiry into "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding" will "be fairly straightforward." *Bruen*, 142 S. Ct. at 2131. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* "Likewise," the Court said, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.*

*Bruen* recognized, however, that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S. Ct. at 2132. Thus, when considering "modern regulations that were unimaginable at the founding," the historical inquiry will "often involve reasoning by analogy." *Id.* In "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation," courts must determine "whether the two regulations are relevantly similar," which will involve considering "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33 (quotations omitted).

14

The Court emphasized that this "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 142 S. Ct. at 2133. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

3. *Federal courts have unanimously held that § 922(g)(9) is constitutional under Bruen.*

While no circuit court has yet addressed the impact of *Bruen* on § 922(g)(9), every district court considering the issue has found § 922(g)(9) to remain constitutional. *See United States v. King*, Case No. 5:22-cr-488, Dkt. No. 33 (W.D. Okla. Mar. 9, 2023); *United States v. Hammond*, Case No. 4:22-cr-177, Dkt. No. 38 (S.D. Iowa Feb. 15, 2023); *United States v. Farley*, Case No. 3:22-cr-30022, Dkt. No. 23 (C.D. Ill. Feb. 8, 2023); *United States v. Gleaves*, Case No. 3:22-cr-14, Dkt. No. 116 (M.D. Tenn. Feb. 6, 2023); *United States v. Martinez*, Case No. 3:17-cr-257, Dkt. No. 121 (N.D. Cal. Feb. 2, 2023); *United States v. Bernard*, Case No. 1:22-cr-3, 2022 WL 17416681 (N.D. Iowa Dec. 5, 2022); *United States v. Jackson*, No. 5:22-cr-59, 2022 WL 3582504 (W.D. Okla. Aug. 19, 2022).

15

C.    *Post-Bruen Analysis of § 922(g)(9)*

   1.    *Nutter is not part of the law-abiding populace protected by the Second Amendment.*

       a. *The Second Amendment protects the rights of law-abiding, responsible citizens.*

*Heller* defined the right to bear arms as belonging to "law-abiding, responsible" citizens, *Heller*, 554 U.S. at 635, a category which clearly excludes those convicted of committing violent crimes against their family members.    *Bruen* echoed that definition, stating no fewer than fourteen times that the Second Amendment protects the rights of "law-abiding" citizens.  *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156.  And, as noted above, a majority of the justices took pains to emphasize that *Bruen* did nothing to upset *Heller*'s and *McDonald*'s reassurances that certain firearms regulations, such as prohibitions on the possession of firearms by felons, are constitutional. *See id.* at 2157 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald . . .*, about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations"); *id.* at 2189 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting) ("I understand the Court's opinion today to cast no doubt on that

16

aspect of *Heller*'s holding" describing certain presumptively lawful category-based restrictions).

Moreover, *Bruen's* endorsement of the "shall-issue" schemes adopted by 43 states provides further evidence that restrictions based on objective criteria including criminal histories—such as § 922(g)(9)—do not infringe on Second Amendment rights. *Bruen*, 142 S. Ct. at 2138 & n.9; *id.* at 2162 (Kavanaugh, J., concurring). *Bruen* indicates that these regimes denying the right to carry to persons previously convicted of domestic violence are constitutional. The Court observed that "these shall-issue regimes, which often require applicants to undergo a background check . . . , are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens.'" *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). As Justice Kavanaugh explained in his concurrence, the shall-issue regimes "are constitutionally permissible" even though they "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring); *see id.* ("Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes . . . may continue to do so."). *Bruen* therefore indicates that the right to carry firearms does not extend to persons previously convicted of domestic violence misdemeanors, as a

17

permissible background check would reveal that such a person was not a law-abiding person. Indeed, if Nutter were to apply for a carry permit in West Virginia, the resulting background check would flag his criminal record and result in a denial. W. Va. Code § 61-7-4. (And, although the State permits carrying a firearm without a license, that entitlement does not extend to residents who have sustained a prior domestic-violence conviction. W. Va. Code § 61-7-7.)

> b. *Those who have been convicted of a misdemeanor crime of domestic violence are not law-abiding citizens protected by the Second Amendment.*

Persons who have previously been convicted of misdemeanor crimes of domestic violence under § 922(g)(9) are not law-abiding, responsible citizens who fall within the scope of the Second Amendment, as authoritatively interpreted in *Heller* and *Bruen*. Section 922(g)(9) applies only to those who have previously been convicted, after due process, of a "misdemeanor crime of domestic violence." § 922(g)(9). A "misdemeanor crime of domestic violence" is defined as an offense that "is a misdemeanor under Federal, State, or Tribal law" and "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, . . ., by a person who is cohabitating with or has cohabitated with the victim as a spouse, parent, or guardian, by a person similarly situated to a spouse, parent, or guardian of the victim, or by a person who has a current or recent former dating relationship with the victim."

18

18 U.S.C. § 921(a)(33)(A); *Chester II*, 628 F.3d at 677 n.4. A person who commits such a crime of domestic violence is not a "law-abiding" citizen and can hardly be termed "responsible."

    c. *Nutter is not a law-abiding person.*

The facts of this case are illustrative. Nutter's prior convictions for domestic violence against a family or household member involved striking and causing physical harm to his then-sixteen-year-old stepdaughter, throwing a full can of beer that struck his live-in girlfriend's seven-month-old child in the chest and upper leg area, and pushing his girlfriend with enough force to cause her to fall backwards and leave a red bruise on her sternum. This is not the conduct of a person who is law-abiding, and such a person can easily be described as dangerous.

Further, Nutter's conduct leading to his § 922(g)(9) conviction in this case was clearly irresponsible and dangerous. A search warrant was executed on Nutter's residence after runaway minors told police that they saw Nutter recklessly waving around loaded firearms and shooting the firearms behind his residence while intoxicated. They also stated that he supplied them with alcohol while they were at his home. Nutter is simply not a "law-abiding, responsible citizen" whose firearm possession is protected by the Second Amendment.

19

In sum, because § 922(g)(9)'s prohibition against possession of firearms requires that the person had previously been convicted, after due process, of the use of physical force or threatened use of a deadly weapon against a person covered by the definition set forth in § 921(a)(33)(A), people subject to § 922(g)(9) are not "law-abiding, responsible citizens" under *Heller* and *Bruen*. Thus, Nutter cannot succeed in his facial challenge, which requires him to show that the statute is "unconstitutional in all its applications." *Bucklew*, 139 S. Ct. at 1127. This Court should uphold the statute on that basis and need not consider whether the government can show that the statute is consistent with historical tradition.

> 2. *In any event, § 922(g)(9) is consistent with the historical tradition of firearm regulation.*

Even if everyone subject to § 922(g)(9) falls within the scope of the Second Amendment right, the statute is constitutional because it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Specifically, § 922(g)(9) is analogous to three types of historical laws: (1) historical laws disarming people for crimes committed; (2) statutes categorically disarming dangerous persons; and (3) surety laws that individually limit firearm possession. Section 922(g)(9)'s prohibition on those who have been convicted criminally for domestic violence thus sits at the intersection of the longstanding history of the prevention of domestic violence and the equally longstanding history of disarming those who have

committed crimes and pose a danger to others. Those who have been convicted of a crime of domestic violence pose a specific type of danger that has been regulated for centuries, as described below. The disarming of those convicted of misdemeanor crimes of domestic violence is constitutional under *Bruen*.

        a.   *Section 922(g)(9) is analogous to historical laws disarming people for crimes committed.*

Misdemeanor crimes of domestic violence, while not themselves felonies, are sufficiently similar to historical felonies to consider the history of felon disarmament as a relevant historical analogue. As a crime that "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon," misdemeanor crimes are relevantly similar to the laws addressing disarmament of violent felons, particularly those convicted of crimes such as malicious maiming and wounding. 18 U.S.C. § 921(a)(33)(A).

For centuries, felonies have been "the most serious category of crime." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019). In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1st ed. 1769). Blackstone observed that "[t]he idea of felony is so generally

connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98 (capitalization omitted).

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General of the U.S.*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). Many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-276 (2014) (citing statutes).

A few examples demonstrate the severe consequences of committing a felony at the time. In 1788, just three years before the Second Amendment's ratification, New York passed a law providing for the death penalty for crimes such as burglary, robbery,

arson, malicious maiming and wounding, and counterfeiting.  2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 664-65 (1886).  The act established that every person convicted of an offense making the person "liable to suffer death, shall forfeit to the people of this State, all his, or her goods and chattels, and also all such lands, tenements, or hereditaments" the person possessed "at the time of any such offence committed, or at any time after."  *Id.* at 666.  For all other felonies, the authorized punishment for "the first offence" was a "fine, imprisonment, or corporal punishment," and the punishment "for any second offense or felony committed after such first conviction" was "death."  *Id.* at 665.

Two years earlier, New York had passed a law severely punishing counterfeiting of bills of credit.  2 Laws of the State of New York Passed at the Sessions of the Legislature (1785-1788) at 260-61 (1886).  The law said a counterfeiter "shall be guilty of felony, and being thereof convicted, shall forfeit all his or her estate both real and personal to the people of this State, and shall be committed to the bridewell [correction house] of the city of New York for life, and there confined to hard labor." *Id.* at 261.  In addition, "to prevent escape," the defendant was to be "branded on the left cheek with the letter C, with a red hot iron."  *Id.*

Similarly, in 1777, Virginia adopted a law for the punishment of forgery, which the legislature believed had previously "ha[d] not a punishment sufficiently exemplary

annexed thereto." 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302 (1821).  The act stated that anyone convicted of forging, counterfeiting, or presenting for payment a wide range of forged documents "shall be deemed and holden guilty of felony, shall forfeit his whole estate, real and personal, shall receive on his bare back, at the publick whipping post, thirty nine lashes, and shall serve on board some armed vessel in the service of this commonwealth, without wages, for a term not exceeding seven years." *Id.* at 302-03.

Throughout the 1700s, other American colonies punished a variety of crimes with death, estate forfeiture, or both.  For example, a 1700 Pennsylvania law provided that any person convicted of "wilfully firing any man's house, warehouse, outhouse, barn or stable, shall forfeit his or her whole estate to the party suffering, and be imprisoned all their lives in the House of Correction at hard labor."  2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896).  A 1705 Pennsylvania law provided that a person convicted of rape "shall forfeit all his estate" if unmarried, and "one-third part thereof" if married, in addition to receiving 31 lashes and imprisonment for "seven years at hard labor."  *Id.* at 178.  As 1715 Maryland law provided that anyone convicted of "corruptly embezzling, impairing, razing, or altering any will or record" that resulted in injury to another's estate or inheritance "shall

forfeit all his goods and chattels, lands and tenements."  1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, The Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811).  A 1743 Rhode Island law provided that any person convicted of forging or counterfeiting bills of credit "be adjudged guilty of Felony" and "suffer the Pains of Death" and that any person knowingly passing a counterfeit bill be imprisoned, pay double damages, and "forfeit the remaining Part of his Estate (if any he hath) both real and personal, to and for the Use of the Colony." Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33-34 (1767).  And a 1750 Massachusetts law provided that rioters who refused to disperse "shall forfeit all their lands and tenements, goods and chattles [sic]," in addition to receiving 39 lashes and one year's imprisonment.  3 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 545 (1878).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158.  Many of these crimes punishable by death or estate forfeiture were non-violent offenses. It is hard to imagine that a crime involving force or a deadly weapon would, at the time of the Founding, have been considered less worthy of disarmament than the crime of forgery

25

or counterfeiting, which were sometimes punishable by death. "Tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment, and that same history and tradition is appropriately considered analogous to those convicted of misdemeanor crimes of domestic violence. *Id.* at 158, 160.

> b. *Section 922(g)(9) is analogous to historical laws that categorically disarmed persons adjudged to be dangerous to the community.*

The right to keep and bear arms, as historically understood, did not extend to those who posed a danger to the state or the community. In England, officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). And "the act of 'going armed to terrify the King's subjects' was 'a great offence at the common law,'" so long as it was committed with "evil intent or malice." *Bruen*, 142 S. Ct. at 2141 (brackets and emphasis omitted) (quoting *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686)). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons—violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259-61 (detailing history).

26

Similarly in America, the colonies (and later the states) enacted statutes that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people."[3] *Bruen*, 142 S. Ct. at 2145. As *Bruen* observed, such statutes "all but codified the existing common law in this regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Several colonies (or states) also passed statutes disarming classes of people deemed to be threats, including those unwilling to take an oath of allegiance (to the crown and later the states), slaves, and native Americans.[4] *See Nat'l Rifle Assoc. of Amer., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 200; Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157-60 (2007); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506-08 (2004); Joyce Lee Malcolm, *To Keep and Bear Arms*, at 140-41 (1994). "In sum,

---

[3] *See, e.g.*, Acts and Laws of His Majesty's Province of New Hampshire in New England 17 (1771) (statute enacted 1701); Collection of All Such Acts of the General Assembly of Virginia 33 (1794) (statute enacted 1786); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807 p. 653 (1807) (statute enacted Jan. 29, 1795); A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99-100 (1836) (statute enacted 1801).

[4] Exclusions based on race or religion would, of course, "be unconstitutional today." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting).

founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting); *but see Folajtar v. Attorney General of the U.S.*, 980 F.3d 897, 909 (3d Cir. 2020) ("[D]angerousness was one reason to restrict firearm possession, but it hardly was the only one."), *cert. denied*, 141 S. Ct. 2511 (2021).

The Second Amendment was therefore adopted against a historical backdrop that allowed disarming dangerous persons. In what *Heller* called a "highly influential" proposal, 554 U.S. at 604, a group of Pennsylvania antifederalists advocated for an amendment guaranteeing the right to bear arms "unless for crimes committed, or real danger of public injury." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts ratifying convention recommending "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) (quoting 2 Schwarz, *The Bill of Rights* 675, 681). These "Second Amendment precursors proposed in the state conventions," *Heller*, 554 U.S. at 603, reflected the well-established common-law principle that dangerous people could be disarmed.

*Bruen* explained that "two metrics" are "central" in asking whether a modern regulation is "relevantly similar" to an asserted historical analogue: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and (2) "whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2132-33. Here, both metrics demonstrate § 922(g)(9)'s constitutionality.

Under the first metric, the question is "how . . . the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. As explained above, in all cases, § 922(g)(9) imposes no burden on a "law-abiding citizen's right" because the conduct leading to a conviction for a misdemeanor crime of domestic violence, by its terms, violates the law.

As to the second metric, "why the regulation[ ]" exists, the historical and statistical data indicate that the burdens imposed by § 922(g)(9) and by historical laws are "comparably justified." *Bruen*, 142 S. Ct. at 2133. Historically, children, the mentally ill, and criminals were deemed untrustworthy either because they lacked the ability to have "virtue" or because they had established that they lacked it. *See* Don B. Kates, Jr., *The Second Amend.: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (Winter 1986). Likewise, classes of people that fell outside the mainstream of society due to their beliefs or based on their race or status, were precluded from bearing arms based on their perceived dangerousness. *See* Churchill, 25 Law & Hist. Rev. at 157-60.

29

While historical laws discriminating based on race or religion are repugnant and would be unconstitutional today for reasons having nothing to do with the Second Amendment, they nevertheless demonstrate that colonial legislatures "had the power and discretion to use status as a basis for disarmament" of those deemed dangerous. *Range v. Attorney General*, 53 F.4th 262, 276 n.18 (3d Cir. 2022) (per curiam), *vacated upon granting of rehearing en banc*, 56 F.4th 992 (Jan. 6, 2023).[5]

Similarly, in modern times, violent domestic misdemeanants are kept from bearing arms due to a Congressional determination of their dangerousness. *See, e.g., United States v. Belless*, 338 F.3d 1063, 1067 (9th Cir. 2003), *abrogated on other grounds by United States v. Castleman*, 572 U.S. 157 (2014) ("The purpose of the statute is to keep firearms out of the hands of people whose past violence in domestic relationships makes them untrustworthy custodians of deadly force."); 142 Cong. Rec. 22985, 22986 (1996) (statement of Sen. Lautenberg) (describing firearm possession by domestic batterers is "dangerous"), (statement of Sen. Wellstone) ("[A]ll too often, the only difference between a battered woman and a dead woman is the presence of a gun.").

---

[5] Though the panel opinion in *Range* has been vacated pending rehearing en banc, the opinion's historical analysis retains its persuasive value.

Thanks to modern social science, the dangerousness of domestic abusers is significantly better documented in modern times than was the purported dangerousness justifying many historic regulations. Between 1980 and 2008, 41.5% of female homicide victims in the United States were killed by their intimate partners (defined as spouse, ex-spouse, or boyfriend/girlfriend). Bureau of Justice Statistics, *Homicide Trends in the United States*, 1980-2008, 10 (Table 6) (November 2011), available at https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf (permalink: https://perma.cc/V4ES-QVM4). "Domestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *United States v. Castleman*, 572 U.S. 157, 160 (2014) (citation omitted). In fact, studies have indicated that, where a gun is in the house, a woman is six times more likely to be killed than other abused women. *Id.* (citing Campbell et al., *Assessing Risk Factors for Intimate Partner Homicide*, Nat'l Inst. Of Justice J., No. 250 at 16 (Nov. 2003)). Additionally, as pointed out by the district court, there is a nexus between domestic violence and mass shootings. JA133 ("[A] proven nexus exists between intimate partner violence and mass shootings . . .. Domestic violence is a significant predictor of mass violence, as evidenced by both available data and an anecdotal review of recent attacks." Natalie Nanasi, *Disarming Domestic Abusers*, 14 Harv. L. & Pol'y Rev. 559, 565 (2020).)

Thus, there are strong reasons to disarm those who have been found guilty, after due process, of a misdemeanor crime of domestic violence. These justifications are just as strong as those supporting the historical prohibitions on firearm possession by those who posed a threat to the community. Under *Bruen*'s historical-tradition test — which expressly directs the Court to consider the "comparabl[e] justifi[cations]" underlying the modern regulation and its historical analogues, 142 S. Ct. at 2133 — § 922(g)(9) is constitutional.

> c. *Section 922(g)(9) is analogous to historical surety laws, which were frequently used to protect abused spouses.*

In addition to the laws discussed above, historical surety laws provide another analogue that demonstrates § 922(g)(9)'s constitutionality. At a basic level, surety laws imposed protections, sometimes including a restriction on firearm possession, where a person was reasonably likely to injure another or to breach the peace.

In England, a "surety of the peace followed an accusation by someone that an individual would likely violate the law in the future." *Young v. Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (*en banc*), *vacated* 2022 WL 2347578 (U.S. June 30, 2022). As Blackstone explained, "wherever any private man hath just cause to fear, that another will burn his house, or do him a corporal injury, by killing, imprisoning, or beating him; . . . he may demand surety of the peace against such person." 4 William Blackstone, Commentaries on the Laws of England 252 (1769).

32

This common-law surety practice carried over to the American colonies. For example, under a 1759 New Hampshire Act, a justice of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatning speeches." Acts and Laws of His Majesty's Province of New Hampshire in New England 1 (1759). And upon "confession" or "legal proof" of the offense, the justice could, *inter alia*, "cause the arms or weapons so used by the offender, to be taken away which shall be forfeited and sold for his Majesty's use." Id. at 1-2; see 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52-53 (1869) (a similarly worded 1692 statute in the Massachusetts Bay Colony).

"In the mid-19th century, many jurisdictions [in the United States] began adopting surety statutes that required certain individuals to post bond before carrying weapons in public." *Bruen*, 142 S. Ct. at 2148; *see Heller*, 554 U.S. at 605 (considering "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" as a means of determining "the public understanding" of the Amendment (emphasis omitted)). Massachusetts was the first state to adopt such a statute in 1836. *Bruen*, 142 S. Ct. at 2148. Under the Massachusetts statute, if any person was armed and could not show a special need for self-defense, he could "on complaint of any person having reasonable cause to fear an

injury, or breach of the peace, be required to find sureties for keeping the peace." Mass. Rev. Stat. ch. 134, § 16 (1836). "Between 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law." *Bruen*, 142 S. Ct. at 2148.

The English and early American surety laws are particularly salient here because they—and the weapons disabilities they contemplated—were critical tools to address nascent societal concerns about domestic violence.  Going back to the English common-law system, spouses could seek protection from abuse and courts could "bind" a dangerous husband "with sureties." *King v. Lord Lee*, 83 Eng. Rep. 482 (K.B. ca. 1675); 1 Blackstone 432-33.[6] And in the United States, certain colonies had specific laws against "spouse beating" while early treatises recognized the criminality of domestic and spousal violence—explaining that a husband or wife "may institute a process against each other, the object of which is to compel them to find securities for their good behavior." *See*, *e.g.*, Tapping Reeve, *The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of*

_____

[6] *See also Lord Leigh's Case*, 84 Eng. Rep. 807 (1674) (the wife "upon affidavit of hard usage, and that she went in fear of her life, prayed security of the peace against [her husband], which was granted"); *Manby v. Scott*, 82 Eng. Rep. 1000, 1005 (Ex. 1659) (observing that a husband "cannot kill" his wife, "nor can he beat her, for the wife can seek the peace"), *as translated by* Henry Ansgar Kelly, "Rule of the Thumb and the Folklaw of the Husband's Stick," 44 J. Legal Ed. 341, 354 (1994); *Sir Thomas Seymor's Case*, 72 Eng. Rep. 966 (K.B. ca. 1615) ("[A] wife can have the peace against her husband for unreasonable correction."), *as translated by* Kelly, 44 J. Legal Ed. at 355.

34

*Chancery* 65-66 (New Haven, Oliver Steele 1816); Carolyn B. Ramsey, "*The Stereotyped Offender: Domestic Violence and the Failure of Intervention*," 120 Penn. State L. Rev. 337, 344 (2015); *see also State v. Davis*, 3 Brev. 5 S.C.L. 3, 4 (S.C. Const. Ct. App. 1811) ("It is clear that a wife may demand sureties of the peace against her husband, and so may her husband against her.").

Section 922(g)(9), then, is simply another step in a long history of efforts to afford some measure of legal protection to those at risk of domestic violence. *Bruen* does not require an *identical* example of historical regulation. Instead, the Supreme Court recognized that "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 142 S. Ct. at 2131. And as such, the applicable "analogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 2133. It "requires only that the government identify a well-established and representative *analogue*, not a historical *twin*." *Id.* (emphasis in original). The historical efforts to provide some measure of statutory or common-law protection for those at risk from domestic violence, coupled with the lengthy history of proscribing the use and possession of guns by dangerous persons, satisfies the test in *Bruen*—domestic abusers were historically deemed to be dangerous and violent individuals, and dangerous and violent individuals have historically been subject to restrictions related to firearms.

35

*3. The 5th Circuit's recent decision in Rahimi invalidating § 922(g)(8) is inapposite.*

In *United States v. Rahimi*, ___ F.4th ___, 2023 WL 2317796 (5th Cir. 2023), the Fifth Circuit invalidated § 922(g)(8)'s disarmament of persons subject to certain restraining orders that were entered after a civil proceeding . Even as to § 922(g)(8), this case has no binding authority in this Court, and the United States believes the case also lacks persuasive value and intends to seek further review. Press Release, Office of the Attorney General, Statement from Attorney General Merrick B. Garland Regarding *United States v. Rahimi* (Feb. 2, 2023), *available at https://www.justice.gov/opa/pr/statement-attorney-general-merrick-b-garland-regarding-united-states-v-rahimi.*

In any event, the Fifth Circuit's analysis has no application to § 922(g)(9). *Rahimi* distinguished "colonial and state laws disarming categories of 'disloyal' or 'unacceptable' people"—which are presumably part of the Nation's historical tradition of firearm regulation—from Section 922(g)(8) because (1) they disarmed people based upon class or group rather than an identified threat to particular potential victims, and (2) the purpose of dangerousness laws was the preservation of political and social order, not the protection of a single individual. *Rahimi*, 2023 WL 2317796 at *9. In other words, the Fifth Circuit viewed Section 922(g)(8) as overly targeted to the

36

protection of individuals rather than the disarmament of a generally dangerous class for the benefit of society.

Section 922(g)(9), by contrast, operates on a generalized criterion—a qualifying conviction—that disarms a broadly dangerous class—domestic-violence misdemeanants. It accordingly aligns with the categorical (rather than individualized) rationale supporting "laws disarming 'dangerous' classes of people" for "the preservation of political and social order, not the protection of an identified person." *Rahimi*, 2023 WL 2317796 at *9. Indeed, in his concurrence in *Rahimi*, Judge Ho made clear his view that there is a fundamental distinction between a person convicted of domestic violence and a person subject to a domestic violence protective order that is significant regarding disarmament under the Second Amendment: "The only way to protect the victim may be to detain *as well as disarm* the violent criminal." *Id.* at *15 (Ho, J., concurring) (emphasis added). While the United States strenuously disagrees with the holding in *Rahimi*, its analysis of § 922(g)(8) is neither persuasive nor relevant as to § 922(g)(9).

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

WILLIAM S. THOMPSON
United States Attorney


s/Andrew J. Tessman
ANDREW J. TESSMAN
Assistant United States Attorney
Southern District of West Virginia

38

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8603 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Calisto MT 14-point type.

s/Andrew J. Tessman
ANDREW J. TESSMAN
Assistant United States Attorney
Southern District of West Virginia

Date: March 16, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2023, I electronically filed the foregoing "BRIEF OF APPELLEE THE UNITED STATES OF AMERICA" with the Clerk of court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

Jonathan D. Byrne
Office of the Federal Public Defender
300 Virginia Street, East – Room 3400
Charleston, WV  25301

Lex A. Coleman
Office of the Federal Public Defender
300 Virginia Street, East – Room 3400
Charleston, WV  25301

s/Andrew J. Tessman
ANDREW J. TESSMAN
Assistant United States Attorney
Southern District of West Virginia

40