---

**APPEAL NO. 22-4541**

---

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID KEITH NUTTER,

Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

---

REPLY BRIEF OF APPELLANT DAVID KEITH NUTTER

---

Wesley P. Page
Federal Public Defender

Jonathan D. Byrne
Appellate Counsel

Lex A. Coleman
Senior Litigator, AFPD

U. S. Courthouse, Room 3400
300 Virginia Street East
Charleston, West Virginia  25301
Telephone: 304/347-3350

*Counsel for Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................iii

ARGUMENT ......................................................................................................... 1

I.   The district court erred by failing to affirmatively find that 18 U.S.C. § 922(g)(9) presumptively violates the Second Amendment under *Bruen*'s first prong.......................................................................................... 2

    A.   Standard of Review................................................................................ 2

    B.   The Second Amendment protects the specific conduct of keeping and bearing arms. Nutter's conduct in this case, possession of four firearms in his home for self-defense, is therefore protected by the Second Amendment's plain text .............. 3

    C.   Protected Second Amendment conduct is not textually or legally narrowed by categorical designations of citizens as "law-abiding" or "virtuous." Characteristics of categories of citizens are analyzed as part of *Bruen*'s second prong, not the first.................. 5

    D.   Section 922(g)(9) directly burdens protected Second Amendment conduct, such that it is presumptively unconstitutional under *Bruen*'s first prong............................................. 7

II.   The district court erred by applying *Bruen*'s second prong, and making the overbroad, overgeneralized finding that Section 922(g)(9) "fit easily within the framework" of keeping "firearms away from dangerous people.".................................................................................................. 8

    A.   "At the time of the Founding" directs *Bruen*'s historical inquiry for federal firearm regulations................................................................... 8

    B.   *Bruen*'s "distinctly similar" and "relevantly similar" inquiries are alternative analogical tools. *Bruen*'s "relevantly similar" inquiry is only available under limited circumstances, and is not a supplemental "do over" for regulations failing *Bruen*'s "distinctly similar" standard ...................................................................... 11

i

C.    The societal problem addressed by Section 922(g)(9) existed at the time of the founding, and is neither "unprecedented," "unimaginable at the founding," or based on any "dramatic technological changes." ........................................................... 13

D.    Section 922(g)(9) is not consistent with any "distinctly similar" historical firearm regulation that existed at the time of the founding ....................................................................................... 14

E.    The district court's resort to historically discriminatory disarmament practices, which would not pass muster today under other parts of the Constitution, does not support finding Section 922(g)(9) constitutional under *Bruen* or the Second Amendment ............................................................................... 16

F.    The Government's response fails to establish any distinctly similar historical tradition of firearm regulation to Section 922(g)(9) ........................................................................... 23

CONCLUSION ...................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................................*Passim*

*Johnson v. United States*, 576 U.S. 591, 602 (2015) ................................................ 3

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................... 6, 7

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .......... *Passim*

*Raffone v. Adams*, 468 F.2d 860 (2d Cir. 1972) ....................................................... 1

*United States v. Bernard,* 2022 WL 17416681 (N.D. Iowa 2022) .......................... 5

*United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999) ..................................... 3

*United States v. Carter*, 750 F.3d 462 (4th Cir. 2014) ........................................... 1

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ..................................... 1, 15, 17

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ....................................... 7

*United States v. Combs*, 2023 WL 1466614 (E.D. Ky 2023) ................................. 5

*United States v. Coombes*, 2022 WL 4367056 (N.D. Okla. 2022) ........................ 5

*United States v. Cruikshank*, 92 U.S. 542 (1875) ................................................... 8

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012) ........................................... 2

*United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023) ...................... 12

*United States v. Hayes*, 555 U.S. 415 (2009) ........................................................ 21

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) ................................................. 1

*United States v. Jackson*, 2022 WL 3582504 (W.D. Okla. 2022) ............................ 5, 17, 23

*United States v. Johnson*, 497 F.2d 548 (4th Cir. 1974) ............................................... 1

*United States v. Lewis*, 2023 WL 187582 (W.D. Okla. 2023) ................................... 12

*United States v. Love*, 2022 WL 17829438 (N.D. Ind. 2022) ................................... 9

*United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012) ............................................... 1

*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) ............................................... 3

*United States v. Perez-Gallan*, 2022 WL 16858516 (W.D. Tex. 2022) ...................... 5, 15

*United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) ............................................... 1

*United States v. Quiroz*, 2022 WL 4352482 (W.D. Tex. 2022) ................................... 5

*United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023) ............................... 3, 5, 24

*United States v. Salerno*, 481 U.S. 739 (1987) ......................................................... 3

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ................................... 7, 15, 18

*United States v. Stambaugh*, 2022 WL 16936043 (W.D. Okla. 2022) ...................... 1

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) .................................... *Passim*

## Constitutional Provisions

U.S. Const. amend. I .................................................................................. 17

U.S. Const. amend. II .......................................................................... *Passim*

U.S. Const. amend. IV ........................................................................... 17

## Federal Statutes

18 U.S.C. § 922(g)(1) ........................................................................... 20

18 U.S.C. § 922(g)(8) ........................................................................... 24

18 U.S.C. § 922(g)(9) .................................................................... *Passim*

## Rules

Fed. R. Crim. P. 12 ............................................................................... 2

## Other Authorities and Sources

Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11 Fam. Violence 19 (1989) ......................................................................................... 15

National Archives, Milestone Documents, Bill of Rights (https://www.archives.gov/milestone-documents/bill-of-rights) ........................... 1

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139 (2007) ....................................................... 15

Stephen P. Halbrook, *When the Redcoats Confiscated Guns*, Washington Post, May 31, 1995 (https://www.washingtonpost.com/archive/opinions/ 1995/05/31/ when-the-redcoats-confiscated-guns/e38d0810-af85-4949-8d93- 3da746601e65/ ....................................................................... 21

Stephen P. Halbrook, *That Every Man Be Armed* (University of New Mexico Press, 1984) ................................................................................... 22

Stephen P. Halbrook, *The Founders' Second Amendment* (Ivan R. Dee Publishers 2008) ........................................................ 22

Wikipedia Commons, United States 1791-09-1792-03.png map,
https://upload.wikimedia.org/wikipedia/commons/4/43/United_States_1791-09-1792-03.png..................................................................................... 9

# ARGUMENT

The Second Amendment was ratified December 15, 1791. *See, e.g.* U.S. Const., amend. II, historical note; *Raffone v. Adams*, 468 F.2d 860, n.4 (2d Cir. 1972); National Archives, Milestone Documents, Bill of Rights (https://www.archives.gov/milestone-documents/bill-of-rights). Every existing federal firearm regulation was enacted during the Twentieth Century or later – including 18 U.S.C.§ 922(g)(9). Generally, those restrictions initially surviving constitutional challenges, at least before *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008), were sustained through rational basis review subject to the unconstitutional collectivist interpretation of the Second Amendment. *See, e.g. United States v. Johnson*, 497 F.2d 548, 550 (4th Cir. 1974). Post-*Heller*, others were sustained through intermediate scrutiny review subject to the individual rights interpretation of the Second Amendment. *See, e.g. United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016); *United States v. Carter*, 750 F.3d 462 (4th Cir. 2014); *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012); *United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012); *United States v. Staten*, 666 F.3d 154 (4th Cir. 2011); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). By dispensing with such means-ends scrutiny, *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 (2022), has refined *Heller* to the point that all modern federal firearm regulations are now subject to reexamination under the Second Amendment, using *Bruen*'s plain text and history standard. *United States v. Stambaugh*, 2022 WL 16936043, *52 (W.D. Okla. 2022)("[a]ll of these status

based restrictions (and more) are now subject to nonfrivolous legal challenges on constitutional grounds after *Bruen*").

*Bruen* says when the Second Amendment's plain text covers an individual's conduct the Constitution presumptively protects that conduct. To justify any regulation, the Government must demonstrate that it is consistent with this Nation's historical tradition of firearm regulation. Only if this showing is made, may a court conclude that an individual's conduct falls outside the Second Amendment's "unqualified command." *Bruen*, 142 S. Ct. at 2126.

This case is *not* about whether the Second Amendment, post-*Bruen,* still "allows a 'variety' of gun regulations." It plainly does. Rather this case is solely about whether Section 922(g)(9), post-*Bruen,* violates the Second Amendment. Where Section 922(g)(9) is inconsistent with any distinctly similar historical tradition of firearm regulation at the time of the founding, the district court plainly erred finding Section 922(g)(9) constitutional under the Second Amendment.

**I.      The District court erred by failing to affirmatively find that 18 U.S.C. § 922(g)(9) presumptively violates the Second Amendment under *Bruen*'s first prong.**

**A.      Standard of Review.**

Under Rule 12 of the Rules of Criminal Procedure, district courts should dismiss criminal charges where there is an infirmity of law in the prosecution, such as an unconstitutional statute. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). This Court's review of the district court's finding Section 922(g)(9) constitutional is *de novo.*

2

*United States v. Moore*, 666 F.3d 313, 316 (4th Cir. 2012); *Staten*, 666 F.3d at 157-158; *United States v. Bostic*, 168 F.3d 718, 721 (4th Cir. 1999). The substantive standard expressly articulated by *Bruen* is what directs this Court's *de novo* review.

The Government asserts limitations on Nutter's challenge to Section 922(g)(9) as part of the applicable standard of review. Government Brief at 7-8. The Government is wrong.[1] As the Fifth Circuit has recently explained in *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), "if a statute is inconsistent with the Second Amendment's text and historical understanding, *then it falls under any circumstances*." (emphasis added). In other words, a statute either is consistent with America's tradition of firearm regulation or it's not. There is no supplemental examination of differences in application. *Bruen* does not allow for further consideration of anything, which is consistent with *Heller*: "[i]t is no answer to say, …, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e. long guns) is allowed." 554 U.S. at 629, 129 S. Ct. at 2818.

**B.    The Second Amendment protects the specific conduct of keeping and bearing arms. Nutter's conduct in this case, possession of four firearms in his home for self-defense, is therefore protected by the Second Amendment's plain text.**

---

[1]  Courts have not strictly adhered to the standard of *United States v. Salerno*, 481 U.S. 739 (1987). For example, in the unconstitutional vagueness context, the Supreme Court has recognized that a statute need not be vague in every application to be facially struck down. *See, Johnson v. United States*, 576 U.S. 591, 602 (2015).

The Second Amendment's plain text provides: "A well regulated Militia, being necessary to the security of the free State, the right of *the people to keep and bear arms*, shall not be infringed." U.S. Const. amend II (1791)(emphasis added).

Through the operative clause, the textual substance of the individual right protected by the Second Amendment is "to keep and bear arms in case of confrontation." *See, Heller*, 554 U.S. at 581, 591; *Bruen*, 142 S. Ct. at 2127. While the Government keeps trying to redefine the actual protected *conduct* by who is doing it, keeping and bearing arms is still the conduct protected by the Second Amendment's plain text. *Heller* acknowledged Second Amendment protection of this *conduct* inside the home, *Heller*, 554 U.S. at 635; *Bruen* acknowledged Second Amendment protection of this *conduct* outside the home. *Bruen*,142 S. Ct. at 2122. Neither the Second Amendment's plain text, or any Supreme Court opinion defines protected Second Amendment conduct by whether or not the person (as one of the "people") engaged in that conduct is a "virtuous" or "law-abiding" citizen.

Authorities seized a .22 caliber revolver, two 20-gauge shotguns, and a.22caliber rifle from Nutter's home. JA123. None of the firearms were "dangerous or unusual," and were in common use at the time. Nutter's conduct, therefore, constituted "keeping arms" within the plain text of the Second Amendment. *See, Heller*, 554 U.S. at 581-592.[2]

---

[2] In a footnote in its opinion, the district court included facts that Nutter has and continues to contest. JA124. The Government presented no evidence in support of those facts at sentencing and the district court did not rely on them when imposing

### C. Protected Second Amendment conduct is not textually or legally narrowed by categorical designations of citizens as "law-abiding" or "virtuous." Characteristics of categories of citizens are analyzed as part of *Bruen*'s second prong, not the first.

The Government persists in trying to redefine the Second Amendment's plain text by arguing that only conduct by some unspecified, mysterious (but still *virtuous*) law-abiding citizen is protected. Government Brief at 16-20. The text of the Second Amendment, however, does not support this narrowing of constitutionally protected conduct to a particular subset of "the people." *See, Heller*, 554 U.S. at 579-580, 128 S. Ct. at 2790-2791.

Post-*Bruen*, several courts have correctly recognized how *Bruen*'s first prong is limited to conduct, and properly rejected the government's assertion that Second Amendment rights only belong to individuals who have not violated any laws. *See, e.g. Rahimi*, 61 F.4th at 451-453; *United States v. Combs*, 2023 WL 1466614 (E.D. Ky 2023); *United States v. Bernard,* 2022 WL 17416681 *6-*7 (N.D. Iowa 2022)*; United States v. Perez-Gallan*, 2022 WL 16858516; *United States v. Coombes*, 2022 WL 4367056 (N.D. Okla. 2022); *United States v. Quiroz*, 2022 WL 4352482, *3-*4 (W.D. Tex. 2022); *United States v. Jackson*, 2022 WL 3582504 (W.D. Okla. 2022). These courts' treatment of Second Amendment protections is wholly consistent with *Heller*'s construction of "the people"

---

sentence. The Government's reference to them in its brief are totally irrelevant to the Second Amendment analysis before this Court.

in the First, Fourth, and Second Amendments. *See, Heller* 554 U.S. at 579-580. As it is with Bruen's first prong's emphasis on protected *conduct*.[3]

That *Heller*'s lengthy majority opinion mentioned "law-abiding citizen" three times, 554 U.S. at 625-626, 635, does not require a different conclusion. Nor does *McDonald*'s lengthy plurality opinion mentioning "law-abiding" only one time, *see,* 561 U.S. at 790, or *Bruen*'s lengthy majority opinion referring to some combination of "law-abiding citizen" or "law-abiding, responsible citizens" over twelve times. *See, Bruen* 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. The "law-abiding" nomenclature, at least in *Bruen*'s majority opinion, was the product of assertions made in the parties' pleading that the two petitioners were law-abiding citizens entitled to firearm permits. *Bruen*, 142 S. Ct. at 2124-2125 ("as set forth in the pleadings below, petitioners … are law abiding, adult citizens"). Use of the term throughout *Bruen* did not define or limit any substantive finding, conclusion, or policy statement within the Court's articulation of the Second Amendment standard of review. *See, e.g.,* 142 S.Ct. at 2124-2125; 2152-2156. Otherwise, Justice Alito's concurrence uses "law-abiding" five times, while Justice Kavanaugh's concurrence only uses the term once. *See,* 142 S. Ct. at 2156. Significantly, "virtuous" and "virtuous citizen" are not mentioned in *Heller*, *McDonald*, or *Bruen* at all.

---

[3] Between *Heller* and *Bruen*, this Court has previously spoken with a similar emphasis on protected *conduct* applying the first prong of pre-*Bruen* Second Amendment review to Section 922(g)(9). *See, United States v. Staten*, 666 F.3d 154, 159 (4th Cir. 2011).

Pre-*Bruen*, in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010), the Seventh Circuit treated the "law-abiding citizens" in *Heller*'s *dicta* as no more than "precautionary language" that was not related to *Heller*'s ultimate holding. *See,* 614 F.3d at 640. In *United States v. Chovan*, 735 F.3d 1127, 1137-1138 (9th Cir. 2013), the Ninth Circuit similarly rejected the government's efforts (repeated here a decade later) to exclude persons subject to Section 922(g)(9) from Second Amendment protections by analogizing the statute to "a 'long line of prohibitions and restrictions on the right to possess firearms by people perceived as dangerous or violent." 735 F.3d at 1137. *Chovan* instead expressly held that the Second Amendment applies to persons covered by § 922(g)(9) - i.e., domestic misdemeanants. *Id.* at 1137-1138. Moreover, "law-abiding citizens" was not used to describe the central holding of *Heller* in *McDonald. See, McDonald,* 561 U.S. at 767-768. Irrespective of Nutter's status, therefore, his conduct is still protected by the Second Amendment for purposes of *Bruen*'s first prong.

### D. Section 922(g)(9) directly burdens protected Second Amendment conduct, such that it is presumptively unconstitutional under *Bruen*'s first prong.

Section 922(g)(9) makes it unlawful for "any person" who "has been convicted in any court of a misdemeanor crimes of domestic violence" to "possess in or affecting commerce, any firearm or ammunition." Nutter plainly has over twenty-year old convictions for misdemeanor crime of domestic violence as set out by his indictment. Section 922(g)(9), therefore, directly burdens, prohibits, and criminalizes Nutter's conduct of possessing, or keeping "arms." As such, Nutter's conduct is protected

conduct under the Second Amendment, which makes Section 922(g)(9) presumptively

unconstitutional under the Second Amendment and *Bruen*. 142 S.Ct. at 2129-2130.

> **II.** **The district court erred by applying *Bruen*'s second prong, and making the overbroad, overgeneralized finding that Section 922(g)(9) "fit easily within the framework" of keeping "firearms away from dangerous people."**

> **A.** **"At the time of the Founding" directs *Bruen*'s historical inquiry for federal firearm regulations.**

In the context of historical federal firearm regulations, *Bruen*'s second prong

focuses on how Second Amendment protections were burdened or otherwise limited

"at the time of the Founding." This is because "constitutional rights are enshrined with

the scope they were understood to have *when the people adopted them*." *Bruen,* 142 S. Ct. at

2136.

In *United States v. Cruikshank*, 92 U.S. 542 (1875), the Supreme Court

acknowledged that the rights protected by the Second Amendment were "not granted

by the Constitution [or] in any manner dependent upon that instrument for its

existence. The second amendment … means no more than that it shall not be infringed

by Congress." *Heller* repeatedly reaffirmed this position, and – in assessing the

constitutionality of a federal firearm regulation – looked to 1791, not 1868. *See, Heller,*

554 U.S. at 592, 619-20. *Bruen* similarly says the Court has "generally assumed that the

scope of the protection applicable to the Federal Government and the States is pegged

to the public understanding of the right when the Bill of Rights was adopted in 1791."

*Bruen,* 142 S.Ct. at 2137. Consistent with *Heller*, "*Bruen* is clear that the Second

Amendment codified a right inherited from our English ancestors, a right that *pre-existed* the Constitution." *United States v. Love*, 2022 WL 17829438, at *4 (N.D. Ind. 2022)(cleaned up). Therefore, the "entire universe of permissible firearm regulations, then, was set at the adoption of the Bill of Rights, if not earlier." *Ibid.*

The emphasis on the time the Constitution and Second Amendment were ratified is the foundation of *Bruen*'s "text and history" standard. What jurisdictions' laws should be consulted as the best evidence for historical restrictions on Second Amendment protections, is examined "at the time of the Founding." The United States' Constitution was signed on September 17, 1787, then ratified by nine of the thirteen state legislatures between December 7, 1787, and June 22, 1788. The Confederation Congress began operating under the new Constitution on March 9, 1789. The Bill of Rights was later ratified on December 15, 1791. So the "time of the Founding" essentially consists of mid-1787 to the end of 1791. Geographically, by the end of 1791, our physical country consisted of thirteen sovereign states, and two territories on the north and south sides of Virginia:[4]

---

[4] Wikipedia Commons, United States 1791-09-1792-03.png map, https://upload.wikimedia.org/wikipedia/commons/4/43/United_States_1791-09-1792-03.png.



States and Territories of the United States of America
September 9 1791 to March 3 1792

Given the composition of our country "at the time of the Founding," post-*Bruen* courts should look to the particular history of laws and traditions followed by the first thirteen states between mid-1787 and the end of 1791. While obviously not exclusive, this would be the strongest and best evidence of any distinctly similar historical tradition of firearms regulation consistent with the Second Amendment, particularly with respect to societal problems which existed in 1791.

**B.** *Bruen*'s "distinctly similar" and "relevantly similar" inquiries are alternative analogical tools. *Bruen*'s "relevantly similar" inquiry is only available under limited circumstances, and is not a supplemental "do over" for regulations failing *Bruen*'s "distinctly similar" standard.

As noted by *amici*, it is important for this Court to recognize that *Bruen* sets out two different and distinct analogical inquiries for determining whether a challenged regulation is consistent with our Nation's historical tradition of firearm regulation. Which inquiry applies depends on what kind of problem a statute targets and whether it is old or new.

Where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." *Bruen,* 142 S. Ct. at 2131. For such statutes, "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Ibid.* (emphasis added). If "the Founders themselves could have adopted" a particular regulation "to confront [a longstanding] problem," but did not do so, then the law "[i]s unconstitutional" today. *Ibid.* Similarly, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Ibid.* Both *Heller* and *Bruen* fell in this first category: the laws challenged in those cases were aimed at a problem – "handgun violence, primarily in urban areas" – that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Ibid.*

11

Conversely, in "other cases," a challenged law will "implicat[e] unprecedented societal concerns or dramatic technological changes," or will be addressed to "challenges" that are "not . . . the same as those that preoccupied the Founders in 1791." *Bruen*, 142 S.Ct. at 2132. Historical inquiry into these statutes "may require a more nuanced approach," which "will often involve reasoning by analogy." *Ibid.* Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are *relevantly similar*." *Ibid.* (emphasis added). The "central considerations" in the "relevantly similar" analysis are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified," what the Court called the "how" and the "why." *Id.* at 2133 (emphasis omitted).

Courts faced with a *Bruen* challenge must identify the problem at which a statute is aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented" or "unimaginable" societal changes. *Bruen*, 142 S.Ct. at 2132; *see also, United States v. Harrison*, 2023 WL 1771138 (W.D. Okla. 2023)("the United States has not identified a single historical law that is 'distinctly similar' to § 922(g)(3) – which *Bruen* suggests is dispositive"); *United States v. Lewis*, 2023 WL 187582, at *3 (W.D. Okla. 2023)("the court concludes, upon careful reading of [*Bruen*], that it does articulate two standards for assessment of the Government's proffered historical analogues, depending on whether the challenged regulation addresses a general societal problem

12

that has persisted since the 18th century, or whether the statute addresses unprecedented societal concerns or dramatic technological changes")(cleaned up).

*Bruen's* historical second prong is not linear, or multi-tiered. If a distinctly similar historical analogue does not exist regarding a societal problem which existed at the Founding, the challenged regulation is unconstitutional. That is the end of the inquiry. The Government is not permitted a less demanding "do-over" to explore whether there might be an alternately "relevantly similar" historical analogue. The distinctly similar and relevantly similar inquiries operate as alternatives: one applies to statutes aimed at *old* problems, the other applies to statutes aimed at *new* problems. The relevantly similar inquiry is not a supplemental approach the Court may turn to if the distinctly similar analysis does not work out. *See, Bruen,* 142 S. Ct., at 2131-2134. Were this the case, and the more deferential standard was what the Court intended to drive the *Buren* second prong analysis in every context, then there would have been no reason for *Bruen* to discuss the "distinctly similar" approach at all – much less apply it in that case.

## C. The societal problem addressed by Section 922(g)(9) existed at the time of the founding, and is neither "unprecedented," "unimaginable at the founding," or based on any "dramatic technological changes".

There should be no dispute that the problem addressed by Section 922(g)(9) was a societal concern that existed at the time of the founding. The Government concedes as much stating that domestic violence was a "nascent society concern" as far back as the 17th Century. Government Brief at 32-35. The district court similarly acknowledged

as much relative to government cited surety laws.  JA110-113; JA129. As a consequence, *Bruen's* distinctly similar standard applies.  The Government has attempted to carry its burden through *Bruen's* "relevantly similar" standard, but it offers no justification for using the more permissive standard.  Since 1791, contrary to the government's assertions - domestic abuse has hardly been "unprecedented" or "unimaginable at the time of the founding," or based on any "dramatic technological changes." If, as the government acknowledges, Section 922(g)(9) addresses a long-standing societal problem, the statute is unconstitutional unless there is a robust historical tradition of "distinctly similar" laws.

### D. Section 922(g)(9) is not consistent with any "distinctly similar" historical firearm regulation that existed at the time of the founding.

The district court actually started it's *Bruen* analysis correctly. The court found that *Bruen* constitutes an intervening decision that relieved the court from any obligation to follow otherwise binding Fourth Circuit precedent. JA127-128. The court then correctly acknowledged and even quoted the "distinctly similar" historical analogue standard under *Bruen's* second prong. JA128. Rather than simply apply that standard, however, the court veered into historical regulations of firearms in sensitive places, and noted a position defendant has never disputed – that *Bruen* at no time addressed the class of regulations prohibiting certain people from carrying firearms. *Ibid.* Then the court went straight into the *Heller dicta,* citing by footnote Justice Kavanaugh's short *Bruen* concurrence. JA129.

14

The court briefly got back on track, further acknowledging that even pre-*Bruen* precedent in this Circuit had recognized "there is not clear historical evidence that those 'longstanding' prohibitions' [in *Heller*], dating to the early 20th Century, existed in similar form in the founding era." JA129, *citing United States v. Chester*, 628 F.3d 673, 680-81 (4th Cir. 2010). The court further noted the absence of any historical regulations like Section 922(g)(9) disarming domestic violence misdemeanants. JA130. Up to this point, the court's findings were consistent with Judge Sykes' pre-*Bruen* dissent in *Skoien*, 614 F.3d 638, 648-49 & 650-51 (7th Cir. 2010)( the "historical evidence is inconclusive at best").[5] The district court's finding, essentially that there was no distinctly similar historical analogue, was also consistent with published empirical data.[6]

---

[5] The court's findings were also consistent with *United States v. Perez-Gallan,* 2022 WL 16858516 (W.D. Tex. 2022), which found that an analysis of the record revealed "during [the] almost 200-year period [from 1633 to 1802], only 12 cases involving wife beating were prosecuted." *Id* at *5. Citing Elizabeth Pleck, *Criminal Approaches to Family Violence, 1640-1980*, 11Fam. Violence 19, 27 (1989). The court further noted that "glaringly absent from the historical record – from colonial times until 1994 – are consistent examples of the government removing firearms from someone accused (or even convicted) of domestic violence." *Ibid.*

[6] In 2007, Robert H. Churchill, a history professor at the University of Hartford, undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based on that survey, Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.

The district court went on to correctly acknowledge that surety laws cited by the Government established that domestic violence was a societal problem during the founding era, and that the founding era addressed the problem through other means - like surety laws – not criminalization of firearm possession and disarmament. JA129. Yet, after acknowledging that neither domestic violence misdemeanants or domestic abusers were disarmed at the time of the founding, when they could have been, the district court dismissively concluded that that absence of any distinctly similar analogue was "not dispositive," and would actually "lead to absurd results." JA130. Essentially the district court rejected directly applying the *Bruen* standard of review based on a result-oriented policy preference, unsupported by distinctly similar or even relevantly similar analogues. Having acknowledged the absence of any historical tradition of disarming domestic violence misdemeanants, the court erred by not dismissing Nutter's indictment.

**E.  The district court's resort to historically discriminatory disarmament practices, which would not pass muster today under other parts of the Constitution, does not support finding Section 922(g)(9) constitutional under the *Bruen* or the Second Amendment.**

The district court erred in several steps taken toward its final conclusion. Despite the complete absence of the terms "law-abiding" or "virtuous" from the Second Amendment's text, the court turned to the Second Amendment's *preamble* and purported standards of militia service to restrict the operative clause's application. JA130-131. This was strained reasoning at best, where *Heller* previously rejected this

approach in finding through the operative clause that the Second Amendment protects an individual right to self-defense against confrontation. *See, Heller*, 554 U.S. at 579-581, 592-603. Both the Government's and the district court's "law-abiding" or "virtuous" citizen constructs further contradict *Heller*'s defining "the people" under the Second Amendment, as being the same "people" under the First and Fourth Amendments.

The district court's position that it could avoid a straightforward application of *Bruen* because laws surrounding domestic violence and criminal law in general have "evolved" since the founding was also error. JA129-130. The fact that over time moving away for the founding era, legislatures enacted more and more laws, does not constitute any unprecedented societal concern, dramatic technological change, or something that would have been unimaginable at the time of the founding. The purported "evolution" of laws, therefore, would not warrant use of *Bruen*'s much more deferential relevantly similar analogue standard, much less conclusion that founding era discriminatory disarmaments were suitable analogues for any historical tradition of firearm regulation.

The district court also erred by favorably accepting *United States v. Jackson*, 2022 WL 3582504 (W.D. Okla. 2022), which analogized domestic violence misdemeanants to convicted felons. *Id*. at 14. Years before *Bruen* was even decided, this Circuit consistently held that Section 922(g)(9) was not constitutional simply by analogy to *Heller*'s "presumptively lawful" *dicta*. *See, United States v. Staten*, 666 F.3d at 160; *United States v. Chester*, 628 F.3d, at 678-679 ("[t]his approach . . . approximates rational basis review").

17

"Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances." *Bruen,* 142 S. Ct. at 2133, n.7. In doing so, courts may not "engage in independent means-ends security under the guise of an analogical inquiry" because "the Second Amendment is the product of an interest balancing with by the people." *Ibid* (cleaned up). The district court ignored that direction in multiple ways. First, it found that without domestic abuse statutes, the founders possessed no mechanism to readily identify and disarm domestic abusers. Second, the court found that domestic abuse laws and Section 922(g)(9) provide a better means for identifying who is a dangerous person than founding era discriminatory distinctions based on race, religion and political views. JA134-137. In substance, the district court surmised that the absence of distinctly similar analogues disarming domestic abusers was based on the absence of domestic abuse laws, as opposed to any conscious societal choices to handling the problem in ways other than citizen disarmament. There is no historical evidence to support this conclusion. By using such historical overgeneralization, the district court effectively revived rational-basis review redressed as an overbroad historical tradition of regulating "dangerousness." Such an overgeneralized approach to historical firearm regulations produces the same result as prohibited rational-basis review, under which the Second Amendment would do nothing. *Heller*, 554 U.S. at 628, n.27; *Skoien*, 614 F.3d at 641.

As consistently argued by the Government to avoid application of *Bruen*'s conduct-based first prong (in order to further avoid having the carry the burden

18

required by *Bruen*'s second prong), "law-abiding citizens" remains a holdover from means-end scrutiny vocabulary and reasoning which contradicts *Heller*'s defining of "the people" under the Second Amendment. The idea - that if the founding era tolerated discriminatory disarmament based on race, religion, and political viewpoint, it would easily tolerate practically any disarmament of discrete categories of citizens deemed undesirable - is not a just a constitutional slippery slope, but a societal cliff. In fact, this proposition is an incredibly pernicious, and precarious position for any governmental institution to assert (just as it would be for any court to accept). The practical problems with the Government's insisting that Second Amendment protections only extend to perfect citizens are two-fold. First, the approach simply does not comport with either prong of *Bruen*'s articulated standard of review, or *Heller* itself. Second, and perhaps even more importantly, neither the Second Amendment's plain text nor any Supreme Court decision defines exactly who or what a given law-abiding or virtuous citizen really is (individually or categorically) in order to deprive everyone else of a fundamental individual right otherwise protected by the Second Amendment.

Are citizens who get parking tickets, exceed the speed limit, or fail to return library books not protected by the Second Amendment? Are citizens caught fishing without the required license? Citizens who are late paying their taxes, recently or twenty years ago? Citizens attending a rally espousing a dissenting viewpoint from a particular government policy? Citizens "parading" as post-*Dodd*'s protesters did around Justices Alito's, Kavanaugh's, and Barrett's homes? Where exactly does the categorical citizen

19

disarmament properly start, and where does it end? When Second Amendment protections *only* apply to some amorphous category of undefined perfect "law- abiding citizens"? The fundamental right protected by the Second Amendment cannot be so arbitrarily constrained, and prior human failings of citizens cannot be the immutable mattress tag which permanently deprives them of such a fundamental constitutional right – at least not per *Bruen* without a strong similar analogue of historical firearm regulation.

The problems with defining "law abiding" or "virtuous" citizens is evident from federal firearm laws as currently written. Those like Nutter, with a prior conviction for a misdemeanor crime of domestic violence, are presumably disarmed because they pose a risk of further violence – but the same is true of those convicted of the same type of violent act direct toward strangers and they are not disarmed under Section 922(g)(9). Likewise, Section 922(g)(1) generally disarms those convicted of felony offenses, but contains exceptions for certain financial crimes, demonstrating the need to carve out some exception from the general class

Any discrete category of citizens could also be deemed "dangerous," and per the court's reasoning also easily fit into some overbroad, overgeneralized historical tradition of disarming "dangerous" citizens. Which is why *Bruen* necessarily requires a *similar* (distinctly or relevantly) historical analogue that fits more closely with a "how' and "why" of a given historical firearm regulation. Using the Court's historical analogues, the "why" was each category's race, religion, and political views which supposedly made

20

such citizens "dangerous." These were completely different from the modern "why" behind Section 922(g)(9), which is to reduce domestic gun violence. *See, United States v. Hayes*, 555 U.S. 415, 426 (2009); *Staten*, 666 F.3d at 159. In substance, therefore, the district court did exactly what the *Bruen* majority expressly discouraged. *See, Bruen,* 142 S. Ct. 2133, n.7.

That the Founding generation would have been reluctant, if not unwilling, to embrace permanent citizen disarmament as a mechanism for societal problem solving, in any context, is not surprising when one keeps in mind the historical circumstances in which the Constitution and the Second Amendment were ratified. British General Thomas Gage's unprecedented deception during the siege of Boston between April 19, 1775 and March 17, 1776, was still very much "top of mind" with the founding generation when our Constitution was ratified in 1791. Recall that shortly after the Battle of Lexington and Concord, Gage extended the offer to Boston colonists to disarm themselves under the promise of being allowed to leave the city. In response, Boston residents surrendered thousands of firearms: 1778 muskets, 634 pistols, 973 bayonets, and 38 blunderbusses. The number of firearms seized by one account was one for every 5.6 inhabitants of a town with a population of 15,000. Having disarmed the local populace, within five days Gage reneged on his promise to allow any exit from Boston, and kept the entire city captive for eleven months. Nothing like that had ever happened in the American Colonies before, nor has it happened since. *See,* Stephen P. Halbrook, *When the Redcoats Confiscated Guns*, Washington Post, May 31, 1995

(https://www.washingtonpost.com/archive/opinions/1995/05/31/when-the-redcoats-confiscated-guns/e38d0810-af85-4949-8d93-3da746601e65/(last viewed December 5, 2022); Stephen P. Halbrook, *That Every Man Be Armed* at 59 (University of New Mexico Press, 1984); Stephen P. Halbrook, *The Founders' Second Amendment* at 2-3, 75-108 (Ivan R. Dee Publishers 2008). As noted in Mr. Halbrook's treatise:

> Americans were reminded of Gage's confiscation of arms some fourteen years later, when adoption of the Bill of Rights was pending. In 1789, Dr. David Ramsay published his *History of the American Revolution*. A prominent federalist, Ramsay wrote this work while he was a member of the Continental Congress in the 1780s. He also served as a delegate to the South Carolina convention that ratified the Constitution in 1788. James Madison, who served with Ramsay in the Continental Congress, was aware of the book. Ramsay's account of grievances leading to the Revolution was apropos, particularly in regard to what became the Second Amendment.

*The Founders' Second Amendment*, at 85-86 (footnotes omitted).

At the time of the founding, firearms were essentially in every citizen's grocery cart, tool chest, and police force. Contrary to the Government's assertions, there was no "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(9). *Bruen*, 142 S. Ct. at 2130-31. The "Founders themselves could have adopted" laws like § 922(g)(9) to "confront" the "perceived societal problem" posed by individuals committing domestic abuse. *Id.* at 2131. But they declined to do so, opting instead in some communities to adopt surety laws and measures other than citizen disarmament. That inaction and lack of disarmament

indicates § 922(g)(9) "[i]s unconstitutional." *Ibid*. The district court should have held the same.

Finally, the district court concluding that there was no historical evidence suggesting that Second Amendment protections were extended to domestic abusers at the time of the founding, subtly flips *Bruen*'s second prong requiring evidence of a historical firearm regulation with a negative inference. This is in the face of overwhelming evidence that domestic abusers were simply not disarmed at the time of the founding, such that there is no distinctly similar historical analogue to Section 922(g)(9). Rather than except that evidence, the District court erroneously dismissed the lack of any distinctly similar historical analogue to Section922(g)(9) as "not dispositive." JA130.

## F. The Government's Response Fails to Establish Any Distinctly Similar Historical Tradition of Firearm Regulation to Section 922(g)(9).

The Government accurately asserts to date no district court has found Section 922(g)(9) unconstitutional. Government Brief at 15. Those cases carry no weight where they incorrectly apply the *Bruen* standard, however. For example, in *Jackson*, even after noting a "paucity of evidence" that American traditions "reached into the home to interfere with domestic relationships," the court ignored *Bruen*'s more demanding distinctly similar standard and went directly to the more deferential "relevantly similar" standard for *Bruen*'s second prong. *Jackson*, 2022 WL 3582504 at *3. That court then relied upon *Heller*'s *dicta* regarding felony

disarmament, to conclude that domestic violence misdemeanants are relevantly similar to felons. *Ibid.*

The Government's extensive reliance on Eighteen Century capital punishment and forfeiture of estates laws is misplaced, Government Brief at 21-32, where none of the cited historical authorities disarmed citizens. "Modern social science" is also irrelevant to *Bruen*'s historical inquiry. *Ibid.* at 31. To the extent they were not put to death, such individuals were not permanently prohibited from possessing firearms. The same was true for the surety laws discussed in the Government Brief at 32-35. The government's sources do not amount to a "well-established and representative" tradition "relevantly similar" to Section 922(g)(9). *Bruen*, 142 S. Ct. at 2132-2133. Finally, the Government fails to meaningfully distinguish *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2003)(holding 18 U.S.C. § 922(g)(8) violated the Second Amendment). Government Brief at 36-37. *Rahimi* readily addresses the insufficiency of the government's reliance on the Militia Act of 1662, laws that prohibited going armed to terrify the king's subjects, laws disarming slaves and Native Americans (who were not considered citizens at the time and thereby not among "the people"), the minority positions of the Pennsylvania and Massachusetts ratifying convictions, and historical surety laws. *Rahimi*, 61 F.4th at 456-461. Nutter incorporates *Rahimi*'s positions on each historical source and urges this Court to reach the same conclusion as the Fifth Circuit.

## CONCLUSION

The analogues identified by the court below are not distinctly similar to Section 922(g)(9), are plainly discriminatory, and would not pass constitutional muster under other parts of the Constitution. Section 922(g)(9) burdens keeping arms, which is conduct protected by the Second Amendment. Under *Bruen*'s first prong, Section 922(g)(9) is presumptively unconstitutional, unless or until the Government carries its burden under *Bruen*'s second prong. Prior to 1996, there was no historical tradition of firearm regulation disarming or otherwise affecting domestic violence misdemeanants. The lack of historical firearm regulation disarming this category of citizens is precisely why Congress enacted Section 922(g)(9). The court below erred in denying Nutter's motion to dismiss. This Court should reverse that ruling, set aside Nutter's conviction, order his immediate release from custody, and dismiss his case.

Respectfully submitted,

**DAVID KEITH NUTTER**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**


**s/Lex A. Coleman**
Lex A. Coleman
Senior Litigator, AFPD
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, WV 25301
Phone: (304) 347-3500
E-mail: lex_coleman@fd.org


**s/Jonathan D. Byrne**
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, WV 25301
Phone: (304) 347-3500
E-mail: jonthan_byrne@fd.org

# CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

I. This reply brief complies with the type-volume limitation of F.R.A.P. 28.1(e)(2) or F.R.A.P. 32(a)(7)(B) because this brief contains **6,075** words, excluding the parts of the brief exempted by F.R.A.P. 32(a)(7)(B)(iii).

II. This brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this reply brief has been prepared using Microsoft Word in 14 point Garamond.

**DATE:** April 10, 2023.   **s/Lex A. Coleman**
             Lex A. Coleman
             Senior Litigator, AFPD
             Office of the Federal Public Defender
             Room 3400, United States Courthouse
             300 Virginia Street East
             Charleston, West Virginia 25301
             E-mail: lex_coleman@fd.org

             **s/Jonathan D. Byrne**
             Jonathan D. Byrne
             Appellate Counsel
             Office of the Federal Public Defender
             Room 3400, United States Courthouse
             300 Virginia Street East
             Charleston, West Virginia 25301
             E-mail: jonathan_byrne@fd.org

## **CERTIFICATE OF SERVICE**

We hereby certify that on **April 10, 2023** the foregoing **REPLY BRIEF** was electronically filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

> Andrew J. Tessman, AUSA
> Office of the United States Attorney
> United States Courthouse, Room 4000
> 300 Virginia Street East
> Charleston, West Virginia 25301
> Email: andrew.tessman@usdoj.gov

> **s/Lex A. Coleman**
> Lex A. Coleman
> Senior Litigator, AFPD
> Room 3400, United States Courthouse
> 300 Virginia Street East
> Charleston, West Virginia 25301
> E-mail: lex_coleman@fd.org

> **s/Jonathan D. Byrne**
> Jonathan D. Byrne
> Appellate Counsel
> Room 3400, United States Courthouse
> 300 Virginia Street East
> Charleston, West Virginia 25301
> E-mail: jonathan_byrne@fd.org