APPEAL NO. 22-4541

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID KEITH NUTTER,

Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

## SUPPLEMENTAL BRIEF OF APPELLANT DAVID KEITH NUTTER

Wesley P. Page
Federal Public Defender

Jonathan D. Byrne
Appellate Counsel

Lex A. Coleman
Senior Litigator, AFPD

U. S. Courthouse, Room 3400
300 Virginia Street East
Charleston, West Virginia 25301
Telephone: 304/347-3350

*Counsel for Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................ii

I.   Recent Fourth Circuit Decisions Do Not Resolve Nutter's Case. ....................... 1

II.  *Rahimi* Does Not Make § 922(g)(9) Constitutional.................................................. 2

III. Generalized labels like "law abiding, responsible citizens" and "dangerous persons" are inconsistent with the Second Amendment's plain text. Using such labels to justify regulations like Section 922(g)(9) lacks any limiting principle, would be easily abused, and would allow legislation to override Constitution protections. ........................................................................ 6

IV.  CONCLUSION................................................................................................ 12

# TABLE OF AUTHORITIES

## Cases

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. Aug. 6, 2024) ....................................... 1

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ............................................. 1, 6-8

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ........................................................ 10

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ............................................. 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .......................... *Passim*

*Range v. United States*, 69 F.4th 96 (3d Cir. 2023) ................................................. 8

*United States v. Canada*, 103 F.4th 257 (4th Cir. 2024) .......................................... 1

*United States v. Coleman*, 698 F. Supp. 3d 851 (E.D. Va. Oct. 12, 2023) ........................ 4, 8

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ........................................... 8

*United States v. Johnston*, No. 3:23-cr-76-GMG-RWT (N.D. W. Va. 2024) ...................... 11

*United States v. McDaniel*, 2024 WL 3964339 (E.D. Wis. 2024) .................................. 9

*United States v. Price*, 111 F.4th 392 (4th Cir. Aug. 6, 2024) .................................... 1

*United States v. Rahimi*, 602 U.S. ___, 144 S. Ct. 1889 (2024) .................................... *Passim*

*Voisine v. United States*, 579 U.S. 686 (2016) ........................................................ 4

## Constitutional Provisions

U.S. Const. amend. II............................................................................................... *Passim*

## Federal Statutes

18 U.S.C. § 922(a)(8) ............................................................................................... 5

18 U.S.C. § 921(a)(33)(A)(ii) ................................................................................... 4

18 U.S.C. § 922(g)(8) ................................................................................... 2-8

18 U.S.C. § 922(g)(8)(C) ............................................................................... 4, 5

18 U.S.C. § 922(g)(8)(C)(i) ................................................................................ 2

18 U.S.C. § 922(g)(9) .................................................................................1-6, 12

Bi-Partisan Safer Communities Act of 2023, 136 Stat. 1313, Pub. L. No. 117-159 (June 25, 2022) ........................................................................................ 5

## Other Authorities and Sources

*Antonin Scalia - Opening Statement on American Exceptionalism to the Senate Judiciary Committee*, American Rhetoric (Oct. 5, 2011), https://www.americanrhetoric.com/speeches/antoninscaliaamericanexceptionalism.htm (last visited Sept. 3, 2024) ................................................................ 11

English Bill of Rights ........................................................................................ 3

English Militia Act of 1662 ............................................................................... 3

## I. Recent Fourth Circuit Decisions Do Not Resolve Nutter's Case.

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. Aug. 6, 2024), and *United States v. Price*, 111 F.4th 392 (4th Cir. Aug. 6, 2024), dealt with whether possession of certain firearms falls within the scope of protected Second Amendment "conduct" at the first step of the analysis set forth in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Nutter did not possess any firearms that were excessively dangerous, *Bianchi*, 111 F.4th at 446, or dangerous and unusual. *Price*, 111 F.4th at 405. Nutter instead possessed a revolver, two shotguns, and .22 caliber squirrel rifle, JA074, all "arms" under *District of Columbia v. Heller,* 554 U.S. 570, 581-587 (2008), which are in common use for lawful purposes. *Id.* at 629 ("the American people consider the handgun to be the quintessential self-defense weapon"), 601, 604 (Americans thought keeping and bearing arms more important for individual self-defense and hunting).

*Bianchi* and *Price* have no bearing on the outcome of this case, which deals with whether domestic violence misdemeanants (i.e., a specific "who") can be permanently disarmed consistent with the Second Amendment. Where 18 U.S.C. § 922(g)(9) expressly prohibits firearm possession it directly burdens protected Second Amendment conduct, regardless of how many additional layers of analysis recent opinions have added to *Bruen*'s step one. Similarly, *Heller's dicta*, *see United States v. Canada*, 103 F.4th 257 (4th Cir. 2024), in no way addresses permanently disarming citizens under § 922(g)(9).

1

## II.     *Rahimi* Does Not Make § 922(g)(9) Constitutional

*United States v. Rahimi*, 602 U.S. ___, 144 S. Ct. 1889 (2024), applied the *Bruen* Second Amendment framework to a criminal law for the first time. In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8)(C)(i), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that the person represents a credible threat to the physical safety of others, is constitutional both facially and as applied to Rahimi. *Id.* at 1902-1903.

*Rahimi* is a narrow decision that does not make § 922(g)(9) constitutional. As to whether that defendant enjoyed any Second Amendment protections as a ***non***-law-abiding citizen, *Rahimi* did not address *Bruen*'s step one, instead going straight into *Bruen*'s step two historical analysis and doing so using only the "relevantly similar" historical analogue standard. The ultimate holding of *Rahimi* is that an individual found by a court to pose a credible threat to the physical safety of another may, consistent with the Second Amendment, be ***temporarily*** disarmed during the life of a domestic violence restraining order. *Rahimi*, 144 S. Ct. at 1903 (emphasis added). *Rahimi* relied upon the ***combination*** of founding era civil surety laws (which did not require disarming citizens or banning firearm possession) and criminal affray laws (which regulated going armed publicly to terrorize other citizens and for which offenders could be imprisoned) to collectively find a sufficient historical tradition to justify temporary disarmament pursuant to § 922(g)(8)'s. This was only after reaffirming *Bruen*'s requirement that any "relevantly similar" historical tradition must still have a

2

comparable justification while imposing a comparable burden on Second Amendment protections. *Id.* at 1898, citing *Bruen*, 597 U.S. at 29 ("Why and how the regulation burdens the right are central to this inquiry").

Despite the various Government arguments to the contrary, *Rahimi* did ***not*** base any of its historical analysis or final decision on the English Militia Act of 1662, the subsequent English Bill of Rights, the minority positions of the Massachusetts or Pennsylvania ratifying conventions mentioning "virtuous" citizens, colonial firearm and gun powder regulations in effect prior to 1791, or generalized English and colonial "dangerous persons" laws that disarmed Protestants, Catholics, Native Americans, slaves, free blacks, or loyalists during the Revolutionary War. *Compare Rahimi*, 144 S. Ct. at 1899-1901 (majority opinion) *with* 1933-1936 (Thomas, J., dissenting). The Supreme Court further expressly stated that it was not deciding whether permanent disarmament of discrete categories of citizens deemed likely to misuse firearms was constitutional. *Id.* at 1901.

The "why" and "how" of *Rahimi*'s purported "relevantly similar" historical analogues do not constitute any "well-established and representative" historical tradition of firearm regulation that would make permanently disarming domestic violence misdemeanants constitutional – facially or as applied to Nutter. To the extent §§ 922(g)(8) and (9) may share a similar "why" with each other or any other historical regulation, their "how" and degree of burden on Second Amendment protections differ

3

substantially. This material divergence of "hows" means the Government cannot prevail on *Bruen*'s step two and is therefore dispositive of Nutter's appeal.

Section 922(g)(8)(C) textually requires a finding by a court that the accused represents a credible threat to the physical safety to another. Section 922(g)(9), by contrast, only requires a prior conviction for a misdemeanor offense having, as an element, the use or attempted use of physical force against the persons identified in that statue. 18 U.S.C. § 921(a)(33)(A)(ii). While the Government may argue that the use or attempted use of "force" required by § 922(g)(9) is similar to *Rahimi*'s and § 922(g)(8)'s finding of a credible threat to physical safety, a closer examination reveals a critical distinction. Specifically, § 922(g)(9)'s force element may be satisfied by the reckless use of force which results in unintended injury to another person. *Voisine v. United States*, 579 U.S. 686, 714 (2016). More importantly, mere reckless offensive touching/contact, as opposed to actual and intended use of physical force causing actual or intended harm, is enough to sustain a conviction for a misdemeanor crime of domestic violence. *See United States v. Castleman*, 572 U.S. 157, 162-163 (2014). Therefore, whereas § 922(g)(9)'s force element may be satisfied both by reckless conduct and by offensive touching, a defendant may be convicted under that statute for *past* conduct even when that defendant does not, as § 922(g)(8)(C) requires, *presently* pose a credible threat to the physical safety of another. Accordingly, *Rahimi* does not compel an affirmance here.

Key to *Rahimi*'s holding is that the disarmament under § 922(g)(8) is temporary. It applies only during the period a domestic relations protective order is in effect, and

4

when the order expires so too does the firearm disability. *Rahimi*, 144 S. Ct. at 1902. Despite involving an actual finding the affected citizen poses a risk of physical harm to another, § 922(g)(8)'s disarmament still automatically dissipates when the relevant order expires. It does not require further court action, further application for relief by the individual subject to the order, or a further express finding of non-dangerousness before the affected citizen may lawfully possess a firearm again. *Ibid.* Section 922(g)(8)'s threat of physical harm finding is also contemporaneous with issuance of the restraining order creating the firearm disability as well as with the finite period during which the affected citizen is disarmed.

Section 922(g)(9)'s disarmament, by comparison, is permanent and persists well beyond the judgment of conviction or sentence imposed for committing a misdemeanor crime of domestic violence. Section 922(g)(9) provides no due process regarding a citizen's later firearm possession, relying instead on whatever due process happened to be afforded relative to the underlying conviction. Citizens convicted of violating § 922(g)(9) now face up to fifteen years imprisonment, 18 U.S.C. § 922(a)(8)(as amended by the Bi-Partisan Safer Communities Act of 2023, 136 Stat. 1313, Pub. L. No. 117-159 (June 25, 2022)), for possessing a firearm in the home for purposes of self-defense after having been convicted for misdemeanor offensive touching of an intimate partner or other household member, thus demonstrating a far more disproportionate and penal "how" than the punishment provided under § 922(g)(8)(C).

5

### III. Generalized labels like "law abiding, responsible citizens" and "dangerous persons" are inconsistent with the Second Amendment's plain text. Using such labels to justify regulations like Section 922(g)(9) lacks any limiting principle, would be easily abused, and would allow legislation to override Constitution protections.

At the outset of *Rahimi*, as here, the Government contended the Supreme Court ***had already held*** that the Second Amendment protects only "responsible, law-abiding" citizens. *See, e.g.*, *United States v. Rahimi*, No. 22-915, Gov't Br. 6 ("As this Court recognized in [*Heller*], and reiterated in [*Bruen*], the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens"); *Id.* at 11 ("this Court's precedents have recognized that Congress may disarm individuals who are not 'law-abiding, responsible citizens'" quoting *Heller*, 554 U.S. at 635); *Id.* at 12 ("In all, [*Bruen*] used the term 'law-abiding, responsible citizens' and its variants more than a dozen times to describe the Amendment's scope"). The Government further contended that, in the Second Amendment context, "not responsible" is simply a synonym for "dangerous," since "a person is not 'responsible' if his possession of a firearm would pose a danger of harm to himself or others." *Id.* at 27. Therefore, the Government argued, § 922(g)(8) is constitutional because it accords with America's tradition of disarming dangerous groups: "Because persons who are subject to domestic-violence protective orders pose an obvious danger to others, they are not 'responsible' individuals, and the Second Amendment allows Congress to disarm them." *Id.* at 29.

6

Despite finding § 922(g)(8) was constitutional as applied to *Rahimi*, the Supreme Court expressly rejected the government's assertion. *Rahimi*, 144 S. Ct. at 1902-1903 While not speaking directly to *Bruen*'s step one, the majority easily held Rahimi could not be disarmed simply because he is not "responsible," and, more importantly, recognized that "responsible" is a vague term. Although *Heller* and *Bruen* "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," those opinions "said nothing about the status of citizens who were not 'responsible.'" *Ibid.* That "question was simply not presented" in *Heller* or *Bruen. Ibid.* In addition, the Court wrote, "'[r]esponsible' is a vague term" that cannot define the contours of Second Amendment protections, since it "is unclear what such a rule would entail." *Ibid.*

Justice Thomas consistently reiterated that the Court had "never adopted anything akin to the Government's test," and that "not a single member of the Court adopts the Government's theory," which Thomas described as "the Government's own creation, designed to justify every one of its existing regulations." *Rahimi*, 144 S. Ct. at 1944, 1945 (Thomas, J., dissenting). Thomas further agreed with Justice Roberts' majority opinion, by also noting the Government's argument "has no doctrinal or constitutional mooring" and finding it "is specious at best." *Id.* at 1945.

*Rahimi* dispenses with any attempt to limit "the people" to "responsible" citizens. And what is true of "responsible" is equally true of "law-abiding," the second half of the government's proposed limitation. *Rahimi* did not specifically address the "law-

7

abiding" portion of the solicitor general's argument because the Government did not claim § 922(g)(8) was justified by Congress' power to disarm non-"law-abiding" citizens. Instead, the Government relied only on a (purported) government power to deny firearms to those who are not "responsible." *See Rahimi*, Gov't Br. 27-29 (arguing § 922(g)(8) defendants are "not 'responsible'" and suggesting, by contrast, that felons and illegal immigrants are not "law-abiding"). But both prongs of the Solicitor General's proposed test derived from *Heller*'s and *Bruen*'s use of those words to describe the challengers in those cases. And just as the "responsible" question "was simply not presented" in *Heller* or *Bruen*, those cases did not address the "law-abiding" question either. *Rahimi*, 144 S. Ct. at 1903. Thus, just as there is no textual distinction in the Second Amendment regarding "the people," a "law-abiding"/non-"law-abiding" line does not "derive from [the Supreme Court's] case law." *Ibid.*; *see also id.* at 1944 (Thomas, J., dissenting)

The term "law-abiding," is every bit as "vague" and "unclear" as the term "responsible." *Rahimi*, 144 S. Ct. at 1903. Neither provides a coherent, workable measure for deciding who is and is not among "the people." *See, e.g., Range v. United States*, 69 F.4th 96, 102 (3d Cir. 2023)(*en banc*)("the phrase 'law-abiding, responsible citizens' is as expansive as it is vague"); *United States v. Duarte*, 101 F.4th 657, 670 (9th Cir. 2024)(same); *United States v. Coleman*, 698 F. Supp. 3d 851, 861 (E.D. Va. Oct. 12, 2023)("the Government's reliance on the Supreme Court's various references to 'law-abiding' persons as support for its contention that felons fall outside the scope of the

8

Second Amendment does not persuade this Court. A phrase that malleable cannot be the peg that the Court references to determine who falls within or beyond the protections guaranteed by the Constitution"). Under *Rahimi*'s reasoning, therefore, "the people" cannot be limited to "law-abiding" citizens. *Accord United States v. McDaniel*, 2024 WL 3964339 (E.D. Wis. 2024). As in *Rahimi*, therefore, the Government's argument that the Second Amendment protects only so-called "law-abiding, responsible citizens" fails.

"Dangerous," just like "law-abiding," "non-dangerous" and "responsible," is also an expansive abstraction. The Government argued in *Rahimi* that legislatures can disarm anyone who is "not responsible," by which it simply meant "dangerous." *E.g., Rahimi,* Gov't Br. 6-7, 11, 13, 27-29, 37. Rahimi countered that the Government's "responsible" metric "admit[ted] to no true limiting principle and risk[ed] swallowing the text of the amendment." *United States v. Rahimi*, No. 22-915, Resp. Br. 35. Nevertheless, at oral argument the Government confirmed that it was "using 'responsible' as a placeholder for dangerous with respect to the use of firearms." *United States v. Rahimi*, No. 22-915, Tr. of Oral Arg. 10. The Government stressed that it was "not using the term 'not responsible' to describe colloquially anyone who you might describe as . . . demonstrating irresponsibility." *Id.* at 9-10. Rather, the Government believed "the principle of responsibility" was "intrinsically tied to the danger you would present if you have access to firearms." *Id.* at 10; *see also id.* at 11 (positing there was "no daylight at all . . . between not responsible and dangerous").

9

It was *this* argument—i.e., dangerousness equals irresponsibility, which justifies disarmament—that the Supreme Court "reject[ed]" in *Rahimi*. 144 S. Ct. at 1903. As stated above, the Supreme Court concluded the term "responsible" is too "vague" and "unclear" to delimit the bounds of the Second Amendment. *Ibid*. It thus follows that "dangerous," the government's proffered definition of "not responsible," is also too "vague" and "unclear."

This conclusion is consistent with *Bruen*. There, the Court held the government must point to a "well-defined" historical tradition similar to the challenged law. *See Bruen*, 597 U.S. at 38. But the term "dangerous" is anything but well-defined. There is no commonly accepted understanding of what renders a person "dangerous" in general, or "dangerous" when armed in particular. The term is so malleable, so open-ended, that legislatures could use it to disarm just about any group they want. *See Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous . . . to delineate the scope of the Second Amendment"); *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019)(Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").

Nor is it clear how courts should determine who is and is not "dangerous." The Supreme Court rejected means-ends balancing, in part, because that approach was not "administrable." *Bruen*, 597 U.S. at 25. Yet it is difficult to conceive of a scheme more difficult to administer in practice than an ill-defined "dangerousness" standard.

10

Basing permanent denial of Second Amendment protections on abstract, non-textual notions of "dangerousness" is not only an incredibly subjective measure, but one that easily facilitates (if not encourages) abuses by Congress, state legislatures, and even courts to pass or uphold laws labeling categories of citizens "dangerous" and thereby easily overriding the Constitution. *See, e.g.*, *United States v. Johnston*, No. 3:23-cr-76-GMG-RWT, ECF 51 at 3, n.1 (N.D. W. Va. 2024)("a 'law abiding' limitation would permit the Government to cite the violation of a statute proscribing the exercise of constitutional rights as the authority supporting the proscription in the first instance. In that way, the Government's 'law abiding' limitation, in addition to being circular, would allow the Government to statutorily override the Constitution"). Generalized "dangerousness" opens the same unworkable Pandora's box as "law abiding, responsible" and "non-dangerous," which should be strongly disfavored in justifying permanent disarmaments of citizens, whether the existing universe of firearm regulations is preserved in its entirety or not.

Holding otherwise would "defeat the purpose of a historical inquiry altogether," *Rahimi*, 144 S. Ct. at 1944 (Thomas, J., dissenting), while effectively reducing the Second Amendment to little more than "a parchment guarantee."[1] Even under *Rahimi*'s more deferential "relevantly similar" historical analysis there still must be some more specific

---

[1] *Antonin Scalia - Opening Statement on American Exceptionalism to the Senate Judiciary Committee*, American Rhetoric (Oct. 5, 2011), https://www.americanrhetoric.com/speeches/antoninscaliaamericanexceptionalism.htm (last visited Sept. 3, 2024).

11

"why" than general dangerousness, as well as meaningful similarities of "why" and "how" to identify a "well-established and representative" historical tradition justifying modern regulations of Second Amendment protections. The Government fails to identify such a tradition.

## IV.    CONCLUSION

Neither recent Fourth Circuit decisions or *Rahimi* make Section 922(g)(9) constitutional, and the Government has failed to identify any "well-established and representative" "relevantly similar" historical analogues overcoming *Bruen*'s step one presumption of unconstitutionality. Accordingly, the district court's ruling should be reversed and Nutter's case dismissed, or alternately remanded with instructions for the district court to do the same.

Respectfully submitted,

**DAVID KEITH NUTTER**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/Lex A. Coleman**
Lex A. Coleman
Senior Litigator
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
Phone: (304) 347-3350
E-mail: lex_coleman@fd.org

12

**s/Jonathan D. Byrne**
Jonathan D. Byrne
Appellate Counsel
Office of the Federal Public Defender, SDWV
Room 3400, United States Courthouse
300 Virginia Street East
Charleston, West Virginia 25301
Phone: (304) 347-3350
E-mail: jonthan_byrne@fd.org

*Dated:* September 6, 2024